(No. 35405.—

FLORA W. LILL, Appellant, *vs.* PAUL A. LILL, Appellee.

*Opinion filed January 22, 1960.*

Dowd & Dowd, of Chicago, (Edward Dowd, and George T. Murphy, Jr., of counsel,) for appellant.

Schumacher, Gilmore, Van Ness & Stern, of Chicago, (George W. Jones, of counsel,) for appellee.

Mr. Justice Daily delivered the opinion of the court:

This appeal, involving a freehold, presents a question of whether two deeds creating a joint tenancy between Leslie Lill, deceased, and his son Paul A. Lill, the appellee, were made in contemplation of marriage so as to defraud appellant, Flora W. Lill, of her rights to dower, homestead and widow's award in the property conveyed. Her

action to set aside the two deeds was dismissed by the circuit court of Cook County in accordance with the findings and recommendations of a master in chancery.

Leslie Lill's first wife, Bertha Engelmann Lill, died on March 8, 1947, and at that time Leslie, as surviving joint tenant, became sole owner of the Chicago property involved, which was their home. Appellee, the only child, was then apparently a minor of elementary school age and he and his father, who was a dining car steward on a Chicago to New York run, thereafter took many meals and spent considerable time with the family of Tilly Engelmann, appellee's maternal grandmother. On December 1, 1955, Leslie caused the premises to be conveyed to himself and appellee as joint tenants and the record is clear that it was a completely voluntary gift to his son. One year and five months later, on April 23, 1957, Leslie and appellant were married and remained as husband and wife, living in the home, until Leslie's death three months later. On November 25, 1957, appellant started this action to set aside the conveyance to appellee, alleging it had been for the fraudulent purpose of depriving her of her marital rights in the property.

To sustain her charge, appellant testified she had become acquainted with Leslie at their place of work, that her first husband died February 4, 1951, that she first went out with Leslie in April, 1953, and saw him thereafter on several occasions each week when his employment permitted him to be in town. According to appellant Leslie asked her to marry him in December, 1954, and again in January, February, August and December, 1955, representing on at least two occasions that his home would be hers, but she told him on all occasions either that "she wanted to wait awhile," or that "she would marry him in the future," or that "she would decide later." She testified he next proposed marriage on March 29, 1956, at which time she promised to marry him but asked him to wait, and that he again proposed in December, 1956, upon which occasion

she set a date in August, 1957, when her vacation would start. She said she considered herself engaged, although no formal announcement was made, and that Leslie had given her a watch on Christmas Eve as a token of the engagement. Continuing, she related she had received a notice on March 15, 1957, that her apartment rent would be increased, whereupon Leslie suggested they should be married right away instead of waiting until August, and that they were thereafter married on April 23, 1957. She said it was not until the following day that she learned title to the house was not in Leslie's name alone, and that the latter promised to change the title but never did.

As opposed to appellant's testimony, Tilly Englemann, two of her daughters and a son-in-law, as well as the appellee, gave testimony from which it appears that Leslie had stated on several occasions that he would not remarry, and that his decision to marry appellant was a hasty one that was not made known to those closest to him until two days before the wedding in some instances, and on the day of the ceremony itself with respect to others. The same testimony reveals Leslie's preoccupation with providing for his son, and his statements that the conveyance of December 1, 1955, was to accomplish such purpose. Eleanor Englemann Smith, a sister-in-law whom Leslie called on the day of the wedding to act as matron of honor, testified that Leslie became ill in the summer of 1956 and discussed with her the possibility of his retirement from work and the purchase of a home in Rochester, Indiana, where Mrs. Smith resided. The same witness told of preparing a will for Leslie which was executed February 9, 1957, and which left all of his property to his son.

On or about the time Leslie made the conveyance to appellee, it appears he was acquainted with and socialized from time to time with three women; the appellant, Pearl King and Ruby McFarlane. The latter, appearing as a witness for appellee, testified she had known Leslie at work

since 1928, and that she had been with him socially from 1953 through the beginning of 1957 at least once a week. She related that he had given her many gifts, including a radio, wrist watch and other jewelry, and that he had told her he would never marry because he wasn't well and because he had his son, the appellee, to care for. The last social visit she had with Leslie occurred on April 21, 1957, two days before his marriage to appellant, at which time he said nothing about an impending marriage, and she first learned of it on the day of the wedding when appellant telephoned the office where both she and appellant were employed.

Several letters written by appellant to Leslie were introduced in evidence and serve greatly to refute appellant's claim that Leslie was proposing or contemplating marriage with her from December, 1954, onward. In a letter dated December 24, 1954, she berated Leslie for his association with another woman and concluded she was sorry she ever knew him; in another, dated February 21, 1955, she complained because he failed to answer his door bell when she rang, even though he was home, and because he had passed her by on a street. Again, in a letter dated March 5, 1955, she wrote: "This business of trying to be a friend and doing to help a friend is for the birds," and thereafter stated she was "going to shop around for a husband." A letter of November 5, 1955, reproved Leslie for having made slanderous remarks about her and stated: "My belief in your friendship is just the same as it was two years ago when you first called me and asked me to go out with you." Most significant, however, is a letter dated December 31, 1956, particularly when it is recognized that it was written one year after the conveyance to appellee, and only a few days after appellant had purportedly accepted a proposal of marriage and set a date in August, 1957. For the most part the letter chided Leslie for his association with other women and for his inattention to appellant. At one stage

of the letter appellant wrote: "One other little thing when we go out to dinner you never want to call for me but insist I meet you inside the restaurant—am I that obnoxious * * *." Later, in the same letter, she wrote: "I am starting 1957 feeling the same—I love you very much—but will never play substitute for a gutter bitch not good enough to shine your or my shoes," then concluded by saying: "I don't like to write this but when you decide to see me again it may be several months as you forbid me to stop in to see you." Largely on the basis of these letters, the master concluded that on or prior to December 1, 1955, Leslie was not contemplating marriage to appellant or any other woman, and that the conveyance to his son was not in fraud of appellant's marital rights.

It has been well settled in a number of cases ranging from *Freeman* v. *Hartman,* 45 Ill. 57, to *Moore* v. *Moore,* 15 Ill.2d 239, that a voluntary conveyance by either party to a marriage contract, of his or her real estate, made without the knowledge or consent of the other on the eve, or in contemplation, of marriage, is *prima facie* a fraud upon the other's marital rights, and the burden is upon the grantee to establish its validity. There must be a fraudulent intent, which may be ascertained by inference from the circumstances, but it need not necessarily be directed against any particular person. (*Higgins* v. *Higgins,* 219 Ill. 146; *Jarvis* v. *Jarvis,* 286 Ill. 478.) Not every voluntary conveyance is in fraud of the rights of the intended spouse, and if it be the intent of the grantor to provide for his children, and not to defraud his wife, such conveyance will not be held fraudulent where the advancement is reasonable, when considered with reference to the grantor's property. (*Ellet* v. *Farmer,* 384 Ill. 343; *Daniher* v. *Daniher,* 201 Ill. 489; *Jarvis* v. *Jarvis,* 286 Ill. 478; *Jones* v. *Jones,* 213 Ill. 228.) While there can be no arbitrary demarcation as to time between fraudulent and valid transfers, the time at which a man transfers his property

before marriage is material in determining whether the conveyance can be deemed a fraud on the future wife's marital rights. The term "in contemplation of marriage" has no rigid meaning as to the exact period of time within which a transfer is fraudulent, it being necessary, rather, to consider and decide each case in light of the particular factual situation. *Jarvis* v. *Jarvis,* 286 Ill. 478.

When the particular facts of the instant case are considered in light of the foregoing principles and decisions, we think it clear that the conveyance by Leslie Lill to his son was not a fraud upon the marital rights of appellant. The record is completely devoid of proof that he was, at the time of the conveyance, entertaining a general intent to marry some person not yet selected, or decided upon, and lacks satisfactory or convincing proof that he then had any intention of marrying the appellant. As to the former, the undisputed proof is that he had frequently expressed his intention not to remarry because of an obligation he felt to provide for the care and education of his son and, later, because of the state of his health. Appellant's testimony that Leslie started proposing marriage to her in December, 1954, (one year before the conveyance) and that she ultimately accepted him in December, 1956, (one year after the conveyance) is completely refuted and rendered inherently improbable by the letters she wrote him. While such letters may show that appellant was hoping and thinking in terms of marriage, they show with equal clarity that Leslie, as late as December 31, 1956, entertained no similar thoughts and that appellant was well aware of the uncertainty of her place in his plans and affections. No reference is made to marriage, or proposals of marriage, nor is the relationship of the parties ever appraised or commented upon in terms other than friendship. Indeed, the tone of all appellant's letters is to berate Leslie for his association with other women and to plead with him for his indifference to her. In short the letters require neither minute

analysis nor inference to satisfactorily establish that Leslie was not contemplating marriage to appellant, either prior to or at the time the conveyance was made, or for a considerable period thereafter. Bolstering this conclusion is the precipitate manner in which the ultimate marriage was planned and carried out.

The decree of the circuit court of Cook County was correct and is therefore affirmed.

*Decree affirmed.*