*In re* ESTATE OF MAX GOLDSTEIN, Deceased (Ann J. Goldstein, Independent Adm'r of the Estate of Max Goldstein, Deceased, Petitioner-Appellant, v. Joseph Goldstein *et al.*, Respondents-Appellees).

First District (4th Division)    No. 1—97—1183

Opinion filed November 20, 1997.

Norman H. Lesser, of Chicago, and James K. McCabe, of Brookfield, for appellant.

William H. LeVitus, of Chicago, for appellees.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

Shortly before his death, Max Goldstein told his wife Ann his brother Joseph would care for her financially when Max died. Ann Goldstein received only some furniture and a car after Max's death.

Ann, as independent administrator of Max's estate, now appeals the trial court's rejection of her amended three-count citation to recover assets from Joseph and Bessie Goldstein, her husband's siblings.

FACTS

The relevant facts come from the amended citation to recover assets and from the trial testimony of Joseph, Bessie, and Ann Goldstein.

In the 1920s, Benjamin Goldstein opened a family business selling candy in Forest Park. After several years, Benjamin converted the candy store into a restaurant/gas station. Benjamin and his wife Flora had eight children: Jacob, Mathilda, Barney, Harry, Eva, Joseph, Bessie, and Max. All the Goldstein children, except Jacob, worked in the family business as they matured. Eventually, the Goldstein family also owned other properties including a commuter parking lot in Forest Park, a vacant lot in Maywood, and the family residence in River Forest.

The Goldstein family created what they termed a "family pot" for the businesses, the properties, and the family earnings. The expenses of the businesses and properties, as well as the expenses of individual family members, were paid from this fund. The family pot included bank accounts at several area banks.

In time, Jacob and Mathilda drifted from the family businesses. Barney married and continued to work in the restaurant. Harry worked in the gas station. Eva worked at a department store in Chicago, but remained involved in the family businesses. Bessie cared for the Goldstein parents, Benjamin and Flora. Joseph managed the restaurant. Max managed the gas station and the parking lot, and acted as treasurer of the family pot.

According to Bessie, the Goldstein family had an unwritten rule: before any sibling married, that sibling's share of the family pot would be transferred to the remaining unmarried siblings. Apparently, the existence of this unwritten rule was not shared with the sibling's bride or groom to be.

Shortly before Max's marriage in 1966, Max conveyed, without consideration, his joint tenancy interest in four family properties to his unmarried siblings—Joseph, Bessie, and Eva. Joseph, Bessie, and Eva remained joint tenants in the family properties. When Eva died, Joseph and Bessie assumed Eva's joint tenant interests. Ann never knew of these conveyances. Max continued working in the family businesses and controlling the expense payments from the family pot.

In 1993, when Max died, he left only a car and some furniture to

Ann. Joseph and Bessie told Ann she would receive no more money. Ann filed her three-count citation as independent administrator of Max's estate to recover assets from Joseph and Bessie.

On July 2, 1996, the trial court dismissed counts I and II for failure to state a cause of action (section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 1992))). On October 25, 1996, at the close of Ann's evidence at trial, the court dismissed count III for failure to present sufficient evidence for a *prima facie* case (section 2—1110) (735 ILCS 5/2—1110 (West 1992)). This appeal followed.

DECISION

On appeal, Ann makes three arguments. First, Ann contends the trial court should not have dismissed count I because it stated a cause of action for invalidly defeating a marital right by a transfer of property immediately before marriage. Second, Ann contends the trial court should not have dismissed count II because it stated a cause of action for invalidly defeating a marital right by colorable or illusory transfer of property. Third, Ann contends the trial court should not have dismissed count III at trial because an oral partnership existed between Max and his siblings.

The trial court dismissed counts I and II for failure to state a cause of action under section 2—615(a), finding Ann had failed to allege sufficiently that Max's 1966 transfers of property invalidly defeated her marital rights. See 735 ILCS 5/2—615(a) (West 1992).

■ A motion to dismiss under this section "tests the legal sufficiency of a pleading and a court must accept all well-pleaded facts as true." *Doe v. Calumet City*, 161 Ill. 2d 374, 381, 641 N.E.2d 498, 503 (1994). On appeal, the standard of review for a section 2—615 dismissal is *de novo*. *Hough v. Kalousek*, 279 Ill. App. 3d 855, 665 N.E.2d 443 (1996).

In count I, Ann pleaded the following facts: Max and Ann became engaged on February 23, 1966. For some time before their engagement, Max and some combination of his siblings owned four parcels of land as joint tenants: a restaurant/gas station, a commuter parking lot, a vacant lot, and the family residence.

In 1959, Max, Joseph, Bessie, and Eva conveyed the vacant lot to a land trust, which sold this parcel in 1966. On March 3, 1966, pursuant to an informal family agreement, Max conveyed his interests in the restaurant/gas station, the commuter parking lot, and the family residence to his siblings Joseph, Bessie, and Eva as joint tenants. Max made these conveyances without consideration and without the knowledge or consent of his then-fiancee Ann.

Eva predeceased Max, and her joint tenant interest in these

parcels passed to Joseph and Bessie. Joseph and Bessie still own the residence. Joseph and Bessie eventually sold the restaurant/gas station and the commuter parking lot. They continue to receive proceeds from the sale of the restaurant/gas station, and they have invested the proceeds from the other sales.

Ann contends Max intended to defraud her of her marital rights despite his repeated assurances that his siblings would care for her after his death.

In count II, Ann pleaded the following additional facts. After the conveyances to his siblings, Max continued to own these parcels. Max still controlled the checking account for the family pot. Max paid the maintenance costs on these parcels, as well as the living expenses of his siblings, himself, and Ann. Max's social security income was deposited into this account.

Ann contends the conveyances were "colorable and illusionary [*sic*]" and fraudulent as to her marital rights.

■ Count I attempts to state a claim for invalidly defeating a marital right by a transfer of property immediately before marriage. Illinois courts have long recognized this cause of action. See *Lill v. Lill*, 18 Ill. 2d 393, 164 N.E.2d 12 (1960); *Moore v. Moore*, 15 Ill. 2d 239, 154 N.E.2d 256 (1958); *In re Estate of Tomaso*, 82 Ill. App. 3d 286, 402 N.E.2d 702 (1980); *Michna v. May*, 80 Ill. App. 2d 281, 225 N.E.2d 391 (1967); *Stathos v. La Salle National Bank*, 62 Ill. App. 2d 398, 210 N.E.2d 828 (1965). See also *Bozarth v. Bozarth*, 399 Ill. 259, 77 N.E.2d 658 (1948); *Ellet v. Farmer*, 384 Ill. 343, 51 N.E.2d 570 (1943); *Jarvis v. Jarvis*, 286 Ill. 478, 122 N.E. 121 (1919); *Dunbar v. Dunbar*, 254 Ill. 281, 98 N.E. 563 (1912); *Higgins v. Higgins*, 219 Ill. 146, 76 N.E. 86 (1905); *Jones v. Jones*, 213 Ill. 228, 72 N.E. 695 (1904); *Daniher v. Daniher*, 201 Ill. 489, 66 N.E. 239 (1903); *Freeman v. Hartman*, 45 Ill. 57 (1867).

In *Moore*, the court held a transfer of real estate by one spouse "on the eve of marriage, is a fraud upon the marital rights of the other [spouse], and such conveyance may be set aside as fraudulent and void." *Moore*, 15 Ill. 2d at 241, 154 N.E.2d at 257. In *Lill*, the court modified this rule:

> "[A] voluntary conveyance by either party to a marriage contract, of his or her real estate, made without the knowledge or consent of the other on the eve, or in contemplation, of marriage, is *prima facie* a fraud upon the other's marital rights, and the burden is upon the grantee to establish its validity. *** Not every voluntary conveyance is in fraud of the rights of the intended spouse, and if it be the intent of the grantor to provide for his children, and not to defraud his wife, such conveyance will not be

held to be fraudulent where the advancement is reasonable, when considered with reference to the grantor's property." *Lill*, 18 Ill. 2d at 398, 164 N.E.2d at 15-16.

■ Count II attempts to state a claim for invalidly defeating a marital right by an illusory or colorable transfer of property. Illinois courts have more recently recognized this cause of action. See *Johnson v. La Grange State Bank*, 73 Ill. 2d 342, 383 N.E.2d 185 (1978); *Vitacco v. Eckberg*, 271 Ill. App. 3d 408, 648 N.E.2d 1010 (1995); *In re Estate of Chester Mocny*, 257 Ill. App. 3d 291, 630 N.E.2d 87 (1993); *Payne v. River Forest State Bank & Trust Co.*, 81 Ill. App. 3d 1128, 401 N.E.2d 1229 (1980). See also *Montgomery v. Michaels*, 54 Ill. 2d 532, 301 N.E.2d 465 (1973).

In *Johnson*, the court held an *inter vivos* transfer of personal property by one spouse, when intended to defeat a statutory marital interest of the other spouse, is voidable if a present donative intent does not exist. *Johnson*, 73 Ill. 2d at 361, 383 N.E.2d at 194. However, the court also held an *inter vivos* transfer into joint tenancy carries a presumption of present donative intent. *Johnson*, 73 Ill. 2d at 368, 383 N.E.2d at 197. This presumption can be overcome only by clear and convincing evidence the transfer was made solely to establish a convenience account. *Johnson*, 73 Ill. 2d at 369, 383 N.E.2d at 197. "A convenience account is an apparent joint account which the creator of an account established to enable another tenant to write checks from the account at the direction and for the benefit of the creator." *Mocny*, 257 Ill. App. 3d at 296, 630 N.E.2d at 92.

While property owners generally have the right to dispose of their property in any manner they wish, there are some narrow, well-defined limits. A claim for transfer of property immediately before marriage protects the nontransferring spouse's marital rights before marriage. A claim presented for illusory or colorable transfer of property protects the nontransferring spouse's marital rights before and during marriage.

Although both counts I and II purport to state well-established claims for invalidly defeating marital rights, both counts share a similar problem. Joseph and Bessie did not owe Ann a duty to protect her marital rights from Max's 1966 conveyances. If there was any fraud, it was Max's.

■ The Probate Act of 1975 provides for independent administration of decedents' estates. See 755 ILCS 5/28—1 *et seq.* (West 1992). An independent administrator can administer the decedent's estate without court supervision. 755 ILCS 5/28—1 (West 1992). As independent administrator, Ann represented Max's estate. However, counts I and II of Ann's amended citation state her individual claims against the estate for invalidly defeating her marital rights.

■ A defrauded wife may, as an individual creditor, bring a citation proceeding within her deceased husband's probate case, while administration of the estate is underway. *Rozycki v. Gitchoff*, 180 Ill. App. 3d 523, 536 N.E.2d 130 (1989). Thus, if the defrauded wife is also the administrator, she should bring a personal citation proceeding within the probate case. See *Stathos*, 62 Ill. App. 2d at 398, 210 N.E.2d at 828 (allowing a defrauded spouse to sue as an individual and as administrator of her deceased husband's estate). Ann could wear both hats: independent administrator and estate creditor.

Ann contends she was the only one involved in counts I and II, which presumably means her status as independent administrator allows her to assert her marital rights claims in this case. We disagree. Because Ann failed to name herself as an individual, as well as an independent administrator, counts I and II are, in effect, by the estate against the estate. In truth, Max's estate, through Ann, sued Max's estate to invalidate Max's conveyances.

> "Estoppel by deed is a bar which precludes a party to a deed from asserting as against the other party any right or title in derogation of the instrument or from denying the truth of any material fact asserted in it." 18 Ill. L. & Prac. *Estoppel* § 4 (1956).

In 1966, Max conveyed his joint tenant interests in the restaurant/gas station, the commuter parking lot, and the family residence by quit-claim deed to Joseph, Bessie, and Eva. Clearly, Max's estate cannot assert any rights against these grantees. Requiring an individual plaintiff to assert individual claims does not elevate form over substance. It is not a technical matter.

There is no real plaintiff here. For that reason alone the trial court's judgments on counts I and II should be affirmed.

Additionally, as the trial court indicated, Max did not own the property in fee simple before conveying his interests to his siblings. Instead, Max was a joint tenant in each of these parcels before conveying his interests. The issue becomes whether counts I and II present valid claims where the transferring spouse who later died conveyed property he held as a joint tenant. Our research has revealed no authority with facts similar to this case.

■ A joint tenancy is "a present estate in all the joint tenants, each being seized of the whole." *Partridge v. Berliner*, 325 Ill. 253, 257, 156 N.E. 352, 353 (1927). "An inherent feature of the estate of joint tenancy is the right of survivorship, which is the right of the last survivor to take the whole of the estate." *Harms v. Sprague*, 105 Ill. 2d 215, 224, 473 N.E.2d 930, 934 (1984); *In re Estate of Regelbrugge*, 225 Ill. App. 3d 593, 588 N.E.2d 351 (1992); *In re Estate of Martinek*, 140 Ill. App. 3d 621, 488 N.E.2d 1332 (1986).

■ If Ann's complaint sufficiently alleged claims for invalidly defeating her marital rights, the remedy would be invalidating the 1966 conveyances from Max to his siblings. But voiding these conveyances would merely place the parcels back into pre-1966 joint tenancies. Max owned the restaurant/gas station as a joint tenant with Joseph. Max owned the commuter parking lot, the vacant lot, and the family residence as a joint tenant with Joseph, Bessie, and Eva.

These pre-1966 joint tenancies never included Ann. Ann has no right of survivorship, and thus no marital right, in this property even if Max's conveyances are set aside. See *Prewitt v. Prewitt*, 397 Ill. 178, 73 N.E.2d 312 (1947) (a wife has marital interest in her husband's joint tenancy property only where joint tenancy is extinguished, allowing husband to assume property in fee simple).

Ann contends Max's siblings severed these pre-1966 joint tenancies. First, Ann contends Joseph severed the pre-1966 joint tenancy in the restaurant/gas station in 1966 by conveying his joint tenant interest to himself, Bessie, and Eva in the same deed used by Max. But counts I and II seek to invalidate this exact conveyance. Ann cannot insist on the validity of Joseph's conveyance while disputing Max's conveyance.

Second, Ann contends Joseph, Bessie, and Eva severed the pre-1966 joint tenancies in the commuter parking lot and the family residence by conveying their joint tenant interests to land trusts. But Joseph, Bessie, and Eva did not convey their interests in these parcels to land trusts until 1981. While the 1981 transfers did destroy the joint tenancies between Joseph, Bessie, and Eva, these transfers do not affect the pre-1966 joint tenancies which included Max.

Third, Ann contends Max and his siblings severed all the pre-1966 joint tenancies because the unwritten rule was an agreement contrary to joint tenancy. See *Estate of Dompke v. Dompke*, 186 Ill. App. 3d 930, 542 N.E.2d 1222 (1989). But Max and his siblings never agreed to dissolve all common ownership. Rather, the unwritten rule showed the Goldsteins' intent to create and to recreate common ownership among unmarried siblings. Once Max married, he transferred his interest into the common ownership of his unmarried siblings.

Finally, the record disputes Ann's claims as to the vacant lot. Max, Joseph, Bessie, and Eva bought the vacant lot in 1959 and transferred their interests to a land trust in 1960, long before Ann and Max were engaged in 1966. The vacant lot was sold by the trustee in 1966, and the proceeds from the sale went into the family pot. Ann cannot claim Max invalidly transferred the vacant lot in derogation of her marital rights six years before they were engaged.

The trial court correctly dismissed counts I and II.

The trial court dismissed count III at the close of Ann's evidence under section 2—1110, finding Ann had failed to present sufficient evidence of a partnership between Max and his siblings. See 735 ILCS 5/2—1110 (West 1992).

■ When ruling on a section 2—1110 motion, the trial court must apply a two-part analysis. *Kokinis v. Kotrich*, 81 Ill. 2d 151, 407 N.E.2d 43 (1980); *Evans v. Gurnee Inns, Inc.*, 268 Ill. App. 3d 1098, 645 N.E.2d 556 (1994). First, the court must determine as a matter of law whether the plaintiff has presented a *prima facie* case. *Kokinis*, 81 Ill. 2d at 154-55, 407 N.E.2d at 45. That is, did the plaintiff present some evidence on each of the elements of her case? Second, if the plaintiff has presented a *prima facie* case, the court must consider and weigh all the evidence offered by the plaintiff, including evidence favorable to the defendant, to determine whether the *prima facie* case survives. *Kokinis*, 81 Ill. 2d at 155, 407 N.E.2d at 45.

"This weighing process may result in the negation of some of the evidence necessary to the plaintiff's *prima facie* case, in which case the court should grant the defendant's motion ***." *Kokinis*, 81 Ill. 2d at 155, 407 N.E.2d at 45.

If the trial court finds the plaintiff has failed to present a *prima facie* case as a matter of law, the appellate standard of review is *de novo*. *Evans*, 268 Ill. App. 3d at 1102, 645 N.E.2d at 559. If the trial court moves on to consider the weight and quality of the evidence, finding no *prima facie* case remains, the appellate standard of review is the deferential "manifest weight of the evidence" standard. *Evans*, 268 Ill. App. 3d at 1102, 645 N.E.2d at 559.

■ Under the Uniform Partnership Act (UPA), "[a] partnership is an association of two or more persons to carry on as co-owners a business for profit." 805 ILCS 205/6(1) (West 1992). A partnership is a contractual relationship and must stem from mutual consent of the alleged partners. *Maloney v. Pihera*, 215 Ill. App. 3d 30, 573 N.E.2d 1379 (1991). A partnership arises when (1) parties join together to carry on a venture for their common benefit, (2) each party contributes property or services to the venture, and (3) each party has a community of interest in the profits of the venture. *Kennedy v. Miller*, 221 Ill. App. 3d 513, 521, 582 N.E.2d 200 (1991).

■ The burden of proving a partnership exists rests on the party asserting it. *Seidmon v. Harris*, 172 Ill. App. 3d 352, 526 N.E.2d 543 (1988). In determining the existence of a partnership, the trial court should consider the following factors: how the alleged partners have dealt with each other; how each of the alleged partners have dealt with third persons; whether the alleged partners have advertised us-

ing a firm name; and whether the alleged partners have shared profits. *Rizzo v. Rizzo*, 3 Ill. 2d 291, 120 N.E.2d 546 (1954). "Whether a partnership exists is a question to be determined by the fact finder from all the facts and circumstances presented." *Argianas v. Chestler*, 259 Ill. App. 3d 926, 942, 631 N.E.2d 1359, 1369 (1994).

■ Here, the trial court, after careful consideration of the evidence, determined the estate "has not submitted proof that would establish each of the elements of a partnership" between Max and his siblings. This court would overturn the ruling if it were against the manifest weight of the evidence.

The trial court found the following facts.

The family never clearly delineated between business and personal expenses. All the business expenses, as well as the personal expenses of the family members, were paid from the family pot. No family member ever mentioned the word partnership to describe the family businesses or the family pot, and no formal partnership documents existed. Max shared in the profits from the businesses and administered the family pot bank accounts held in joint tenancy.

While all the Goldstein children except Jacob and Mathilda contributed their services to the family businesses, only some of the siblings had a share of the family pot. Notably, though Barney and Harry worked in the family businesses, they were merely employees. Eva did not work in the family businesses, but shared in the family pot because she never married. Bessie did not work in the family businesses, but shared in the family pot because she never married and because she took care of the Goldstein parents.

Max and Joseph did work in the family businesses and also shared in the family pot. Max was the treasurer of the family businesses, allegedly an insider until his death. However, Max was married. Seemingly, family members dealt with each other more like concerned siblings and less like business partners.

The record does not contain significant evidence on how the family members dealt with third persons. The alleged partnership did not operate under a firm name. While the restaurant/gas station had a name, the remainder of the family businesses did not operate under this name.

Ann alleges Max and his siblings shared profits from the family businesses through the family pot bank accounts. While the primary checking account named Max, Joseph, and later Bessie, another checking account listed only Max and Joseph. Other bank accounts named different combinations of Max, Joseph, Bessie, and Eva. Tracking profits from the family businesses through the maze of these accounts, the profits from the family businesses were shared to some

extent. The family members all filed individual tax returns listing different amounts of income.

The UPA provides, "The receipt by a person of a share of the profits of a business is prima facie evidence that he or she is a partner in the business ***." 805 ILCS 205/7(4) (West 1992). However, "[j]oint tenancy *** does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property." 805 ILCS 205/7(2) (West 1992).

Informal sharing of profits through a family bank account does not create a partnership, unless the parties explicitly agree. *In re Estate of Kime*, 42 Ill. App. 3d 505, 356 N.E.2d 350 (1976); *In re Marriage of Hassiepen*, 269 Ill. App. 3d 559, 646 N.E.2d 1348 (1995). In *Kime*, the decedent operated a family farm. The decedent's children all contributed to the operation of the farm. The proceeds from grain sales and all other funds collected from the farm went into the decedent's bank account. The decedent's children took what they needed to live from this account, and the decedent used the balance of the account for the farm. The court held a partnership did not exist between the decedent and his children. *Kime*, 42 Ill. App. 3d at 510, 356 N.E.2d at 354.

Instead, the court found the relationship between the decedent and his children was:

> "[A]n undefined, hit or miss, arrangement, not clearly thought out or enunciated by the parties, based upon an unverbalized meeting of the minds that the specific amounts [of money] anyone took [from the farming operation] were not of great importance, since it all remained in the family." *Kime*, 42 Ill. App. 3d at 509, 356 N.E.2d at 353.

While each item of evidence did not establish conclusively the absence of a partnership, the evidence collectively showed the decedent and his children did not intend to form a partnership. *Kime*, 42 Ill. App. 3d at 509, 356 N.E.2d at 353-54.

In *Hassiepen*, a husband and wife decided to start an electrical contracting business. The husband contributed labor and a truck for the business. The wife provided capital for tools and supplies and handled the general office work for the business. The husband and wife opened a joint checking account, which they used for all business and personal expenses. The court held a partnership did exist between the husband and wife. *Hassiepen*, 269 Ill. App. 3d at 566, 646 N.E.2d at 1354. The court focused on the couple's intent to form a business, as well as their joint provision of services and assets to the business. *Hassiepen*, 269 Ill. App. 3d at 555-56, 646 N.E.2d at 1354.

The instant case more closely resembles *Kime* than *Hassiepen*.

Unlike the husband and wife in *Hassiepen*, the Goldstein siblings did not show any intent to form a business. Instead, like the family farming business in *Kime*, the Goldstein conglomerate was "an undefined, hit or miss, arrangement" which merely carried on what Benjamin started. The trial court, relying upon *Kime*, said:

> "Quite frankly, I don't like what happened here. I think that Ben started the family out on something which really became somewhat self-defeating for various and sundry members of the family. But it was his property and he was obviously the head of the family and they carried through on it.
>
> * * *
>
> The elements of sharing are there. There are many elements that you need to define a partnership that aren't. Who is in the partnership?
>
> * * *
>
> There is not continuity, there is nothing that one can look at and say what is it, when did it start, when is it supposed to end, and who's involved in it?
>
> It was somewhat of a catch as catch can. It was intended so that the family members would be able to live their lives within that context and there was really little thought given to what happens when all the various family members die."

Under the UPA, mere joint tenancy does not signal the existence of a partnership, regardless of shared profits. Here, the siblings held the parcels and the family pot bank accounts in joint tenancy. Additionally, the family members never had a written partnership agreement. Any oral agreement among the siblings neglected important provisions about whom the partnership included, the creation and dissolution of the partnership, and the distribution of partnership assets after dissolution. While other evidence leads to conflicting inferences on the partnership issue, we cannot say the manifest weight of the evidence requires us to overturn the trial court's conclusion that the Goldstein siblings did not intend to create a partnership.

The trial court correctly found for the defendants on count III.

## CONCLUSION

We affirm the dismissal of counts I and II because Ann did not bring individual claims against the estate and because the properties were held in joint tenancy by Max before the 1966 conveyances to his siblings.

We also affirm the dismissal of count III because the manifest

weight of the evidence supports the trial court's finding that a partnership did not exist between Max and his siblings.

Affirmed.

McNAMARA and BURKE, JJ., concur.