CLARA GEORGE MINCH, Plaintiff-Appellant, v. RONALD J. GEORGE, Defendant-Appellee.

First District (6th Division)   No. 1—08—1826

Opinion filed October 30, 2009.

---

Joseph T. Gentleman, of Chicago, for appellant.

Jeffrey W. Brend and Jennifer M. Fletchall, both of Levin & Brend, P.C., and Paul L. Feinstein, of Paul L. Feinstein, Ltd., both of Chicago, for appellee.

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

On June 30, 1982, a judgment for dissolution of marriage was entered by the circuit court of Cook County dissolving the marriage of plaintiff Clara George Minch to defendant Ronald J. George. On April 12, 1984, plaintiff (wife) filed a "Petition to Vacate the Judgment for Dissolution of Marriage" (petition) pursuant to section 2—1401 of the Illinois Code of Civil Procedure (Code) (Ill. Rev. Stat. 1983, ch. 110, par 2—1401 (now 735 ILCS 5/2—1401 (West 2006))) on grounds that her separation agreement with defendant (husband) denied her an equitable distribution of marital assets due to her husband's fraudulent concealment of his interest in certain condominium units located in Florida at the time of the dissolution. On December 3, 1985, the trial court entered an order granting the wife's petition in part and denying it in part, vacating the parties' separation agreement, but refusing to vacate the judgment dissolving the marriage. On June 18, 1987, a supplemental judgment for dissolution of marriage was entered by the trial court, which included a "settlement agreement" by the parties. During the proceedings leading to the supplemental judgment for dissolution of marriage, the husband disclosed in his "Supplemental Answer to Interrogatories and Notice to Produce" the existence of certain loans received from his brother and a friend, secured by 4,406 shares of common stock of Mid-Plains Telephone, Inc. (Mid-Plains). The wife claims she knew of the existence of the stock during the marriage, but also claims she did not know that her husband had an interest in the stock at the time of the entry of the original judgment for dissolution of marriage because the stock powers indicated that part of the stock was transferred to the husband's brother and the balance to the friend. However, the wife was aware that the husband represented that the stock was only security for the loans at the time she executed a settlement agreement which was part of the second

judgment for dissolution of marriage. The wife also knew that the stock was worth $66,000 at the time of the settlement agreement and $50,085 at the time of the entry of the first judgment for dissolution of the marriage.

Approximately 16 years later, on May 21, 2003, the wife filed a new action for fraud, in the law division of the circuit court of Cook County, after learning that the husband sold his interest in Mid-Plains in September of 2001 for $953,546.50. On October 29, 2003, the 2003 fraud action was consolidated with the parties' divorce action, in the domestic relations division of the circuit court of Cook County, which had long been terminated by judgment. A bench trial in this matter commenced on December 17, 2007. At the close of the wife's case, the husband moved for a directed finding pursuant to section 2—1110 of the Code (735 ILCS 5/2—1110 (West 2006)). The trial court granted the husband's motion for a directed finding on December 31, 2007. The wife's motion to reconsider[1] the trial court's December 31, 2007, order was denied on June 12, 2008. The wife filed her notice of appeal on July 2, 2008. We affirm for the reasons set forth below.

## BACKGROUND

The parties were married on September 3, 1960, when they were both 21 years old. Three children were born to the marriage: Michelle, born in 1961; Daniel, born in 1962; and Charles, born in 1964. On June 30, 1982, a judgment for dissolution of marriage was entered dissolving the parties' marriage and disposing of their property rights. On April 12, 1984, the wife filed a petition to vacate the judgment for dissolution under section 2—1401 of the Code (Ill. Rev. Stat. 1983, ch. 110, par. 2—1401 (now 735 ILCS 5/2—1401 (West 2006))) claiming that the separation agreement reached pursuant to the dissolution of her marriage denied her an equitable distribution of marital assets due to her husband's fraudulent concealment of his interest in certain condominium units located in Florida at the time of the dissolution. A hearing was conducted on November 12 and 13 in 1985 where the trial court heard evidence regarding the wife's section 2—1401 petition. The husband filed an answer to the wife's petition denying he held any interest in any condominium units in Florida at the time of the entry of the 1982 judgment for dissolution of marriage.

At the close of the evidence with regard to the section 2—1401 petition, the trial court found that the husband had made a representation at the time of the parties' 1982 separation agreement that he

---

[1]Neither party cites to nor are we able to locate the wife's motion to reconsider the trial court's December 31, 2007, order. However, the record does contain the trial court's order denying that motion.

once owned several condominium units in Florida, but that at the time of the judgment for dissolution of marriage he no longer held any interest in those units. The trial court further found that the evidence before it indicated that the husband retained "all the indicia of owner-ship" over the condominiums at the time of the entry of the 1982 judgment for dissolution, contrary to his representations. Having so found, the trial court vacated the parties' separation agreement incident to the judgment for dissolution of marriage.

On June 18, 1987, a supplemental judgment for dissolution of marriage was entered by the trial court which included a "settlement agreement" executed by the parties. As noted, during the proceedings leading to the supplemental judgment for dissolution of marriage, the husband disclosed for the first time in his "Supplemental Answer to Interrogatories and Notice to Produce" the existence of loans received from his brother and a friend, secured by 4,406 shares of common stock in Mid-Plains. Specifically, the husband's "Supplemental Answer to Interrogatories and Notice to Produce" stated that he received a loan from his brother, Francis George, secured by 2,739 shares of Mid-Plains common stock, and a number of loans from his friend, John Palmer, secured by 1,667 shares of Mid-Plains common stock.

In his "Supplemental Answer to Interrogatories and Notice to Produce," the husband produced several documents entitled "Ir-revocable Stock or Bond Power" which purported to transfer 1,667 shares of Mid-Plains common stock to Palmer from the husband. Although the husband never produced stock powers purporting to transfer Mid-Plains stock to his brother Francis, he testified at trial that he executed documents "similar" to the stock powers executed to Palmer, to Francis. The husband's discovery disclosed that this transfer was only a transfer as security for a debt although the stock powers indicated an outright transfer of all of the husband's rights.

The "settlement agreement" reached in the supplemental judg-ment for dissolution of marriage includes a provision providing that the husband receive the 4,406 shares of Mid-Plains common stock from the marital estate as his "sole and separate property." In fact, the stock was given to the husband in the first judgment for dissolu-tion of marriage also. As noted, the wife knew the stock was worth $66,000 at the time of the settlement agreement. Notwithstanding that fact and after receiving all of this information before executing the settlement agreement, the wife filed a new action for fraud, after learning that her husband sold his interest in Mid-Plains in September of 2001 for $953,546.50. In her new complaint for fraud, the wife al-leges that the shares of Mid-Plains stock were marital property purchased during the duration of the parties' marriage, that the

husband misrepresented that he did not own or control the shares at the time of the entry of the supplemental judgment for dissolution of marriage, that she would not have entered into the settlement agreement incident to the supplemental judgment for dissolution of marriage but for the husband's misrepresentations, that her reliance on the husband's misrepresentations was reasonable, and that she suffered damages. Specifically, the wife claims that the husband "lied" when he represented that the 4,406 shares of Mid-Plains common stock were held by the two creditors as collateral because the stock powers illustrated that the stock was actually transferred to them. The wife claims in the alternative that either the debts were fabricated or the shares of Mid-Plains were not utilized as collateral for the debts had the debts in fact existed. A bench trial on the fraud complaint commenced on December 17, 2007, where the following testimony pertinent to this appeal was presented.

The wife first called the husband as an adverse witness at trial. The husband testified that his brother, Francis George, loaned him $41,085 in September of 1981. The loan from Francis was procured prior to the entry of the 1982 judgment for dissolution of marriage. The husband testified that he executed a promissory note to Francis secured by 2,739 shares of Mid-Plains common stock. The husband testified that he needed the money from Francis to meet his family's monthly expenses of approximately $4,500.

The husband further testified that his friend, John Palmer, loaned him a total of $50,000 in varying increments from July 1982 to December 1983. These loans were procured subsequent to the 1982 judgment for dissolution of marriage but prior to the 1987 supplemental judgment. The husband testified that he executed promissory notes to Palmer on each occasion he received money and gave him 1,667 shares of Mid-Plains common stock as collateral.

The husband testified that he paid off the loans from Francis and Palmer in full plus interest over a period of at least 10 years, which he estimated to be from 1990 to 2000, and that individual payments never exceeded $5,000. The husband testified that the bulk of the moneys to pay off the loans came from the sale of the two condominium units located in Pelican Landing, Florida, and a town house in Park Ridge, Illinois, in the early 1990s. He sold one Florida condominium and obtained a net gain of $250,000, and sold the second for a net gain of $90,000. He also sold the town house for a net gain of $60,000.

The husband testified that in addition to providing Palmer with the promissory notes, he provided Palmer with Mid-Plains stock certificates and three executed documents entitled "Irrevocable Stock or Bond Power." The husband testified that his understanding of the

documents entitled the holder to sell the stock only upon default. The husband further testified that he executed the "Irrevocable Stock or Bond Power[s]" to Palmer in the event he had to declare bankruptcy. The husband testified that he was always the owner of record of the 4,406 shares in Mid-Plains.

Palmer testified by way of evidence deposition. Palmer testified that he loaned the husband between $50,000 and $100,000 over a long period of time and that the loans were eventually paid in full. He testified that the loans included interest, although he could not recall how much interest he received. Palmer testified that the husband executed a promissory note every time he loaned the husband money, although he never demanded or requested the promissory notes. He further testified that the husband gave him stock certificates and documents entitled "Irrevocable Stock and Bond Power" as collateral for the loans. Palmer testified that he never demanded the collateral and would have given the collateral back if the husband had requested it. Palmer testified that the largest amount the husband repaid to him at one time was approximately $10,000. When asked if the husband had ever told him that he was attempting to hide assets from the wife, Palmer responded in the negative. Palmer further testified that he returned the stock certificates to the husband when he requested them back despite the fact that the husband still owed him a balance on the loans.

The wife was the only other witness to testify on her own behalf other than the husband and Palmer. The wife testified that she first learned that the husband still held shares in Mid-Plains in November 2001, after the parties' son informed her that the husband had sold his holdings in Mid-Plains for $953,546.50. The wife testified that she listed a debt to Francis George in the amount of $41,085 in a pretrial memorandum in 1981, which is the same amount the husband stated that he owed his brother in his "Supplemental Answer to Interrogatories and Notice to Produce" dated March 17, 1986. The wife testified that the supplemental judgment for dissolution of marriage as well as the original judgment for dissolution of marriage specified that the husband was to receive 4,406 shares of Mid-Plains common stock. The wife also testified that her father worked for Mid-Plains for many years.

The wife testified that she questioned the legitimacy of the husband's claimed debts prior to agreeing to the settlement agreement incident to the supplemental judgment for dissolution of marriage. She testified that the husband and Palmer were long-time gambling friends and that she believed the loans to the husband from Palmer were fictitious. She testified that when she presumed the

debts to be "bogus," she hired an expert "examiner of questioned documents," to examine only the promissory notes in the possession of Palmer. She testified that the examiner of questioned documents examined the promissory notes dated between July 1, 1982, and November 1, 1985, to determine when the notes were executed. She testified that she also hired a forensic ink analyst to examine the promissory notes. An invoice from the forensic ink analyst contained in the record shows that he examined the promissory notes for a total of five hours. The record does not disclose the findings of either the document examiner or the forensic ink analyst. However, the wife testified that after the document examiner and forensic ink analyst examined the documents, she entered into the settlement agreement incident to the supplemental judgment for dissolution of marriage.

The wife did not call Francis George as a witness. At the close of the wife's case, the husband moved for a directed finding pursuant to section 2—1110 of the Code (735 ILCS 5/2—1110 (West 2006)). As noted, the trial court granted the husband's motion for a directed finding on December 31, 2007. The transcript from the December 31, 2007, hearing, which includes a colloquy between the trial court and the wife's attorney, reads as follows:

"THE COURT: The fraud is that [the husband] says, 'I sold/ transferred this stock on to Palmer and on to his brother Francis,' right?

[THE WIFE'S ATTORNEY]: Right.

THE COURT: Well, how do you get around the fact that [the wife's attorney at the time of the second judgment for dissolution of marriage] had the opportunity to review the original documents? The notes were reviewed, the ink analysis was done *** and he had the original stock powers. And [the wife's attorney at the time of the second judgment for dissolution of marriage] sent a letter back to Palmer that says, 'Hey, I'm sorry for the delay. Here is what you gave me, the originals of the stock certificates and the stock powers.' Why wouldn't she have investigated the fact that he's sitting on these stock powers and the stock certificates without having perfected his lien? How does she get around that?

* * *

Didn't she have the opportunity to examine that and to deal with that at the time of the [supplemental] judgment?

* * *

Did [the husband] misrepresent the debt? No, because you can't come back here today, 20 years later, and say, 'Wait a minute.' There's been no evidence that these debts were false. They were accepted to be true. There's been no evidence—no one has testified

and there's been no evidence that these were not real debts. Did he mislead her? Did he lie to her? He says these debts are secured by these shares of stock. Motion for directed finding granted.

\* \* \*

I find that [the wife] has failed to meet her burden of proof in this case with regards to the fraud. And taking all of the evidence, all the testimony, in the most favorable light to her, she has not met her burden. I find that [the husband] did disclose the existence of the stock. He disclosed the stock had been collateralized, or secured, or whatever you want to call it. I don't think that—well, I think she had the opportunity back at the time of the supplemental judgment to inquire as to why the collateral of the lien had not been perfected. The fact that the stock was not perfected—or the lien wasn't perfected doesn't take away from the fact that he disclosed the existence of the stock and that he disclosed that it was collateralized, and there has been no evidence to show that these debts didn't exist.

This is basically an argument right now: Well, these debts didn't exist because he could have asked for the stock powers of the certificates back at any time. And I did read [Palmer's evidence deposition], and I am aware of the fact that in his deposition he said that he didn't ask for the security, he didn't ask for the notes, but—and that he would have given them back to [the husband] at any time. That doesn't mean that [the husband] didn't owe [Palmer] money; that just means that [Palmer] didn't do anything with [the stock powers]. It should have been up to [Palmer] to perfect the lien on \*\*\* the stock. I can't attribute blame or fraud on [the husband's] part for that. That's the basis for my ruling."

As noted, the trial court denied the wife's motion to reconsider the December 31, 2007, order. This appeal followed.

## ANALYSIS

### 1. Standard of Review

Section 2—1110 of the Code provides that in bench trials, a defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. 735 ILCS 5/2—1110 (West 2006); *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). The wife argues that we should review the trial court's decision *de novo* while the husband argues that we should review it under the manifest weight of the evidence standard. For the reasons that follow, we agree with the husband and must, therefore, determine whether the trial court's decision was against the manifest weight of the evidence. However, no matter what standard of review we use our decision would be the same.

When ruling on a section 2—1110 motion, the trial court must apply a two-part analysis. *In re Estate of Goldstein*, 293 Ill. App. 3d 700, 709 (1997), citing *Kokinis v. Kotrich*, 81 Ill. 2d 151 (1980), and *Evans v. Gurnee Inns, Inc.*, 268 Ill. App. 3d 1098 (1994). First, the trial court must determine as a matter of law whether the plaintiff has presented a *prima facie* case. *In re Estate of Goldstein*, 293 Ill. App. 3d at 709, citing *Kokinis*, 81 Ill. 2d at 154-55. That is, did the plaintiff present some evidence on each of the elements of her case? *In re Estate of Goldstein*, 293 Ill. App. 3d at 709. Second, if the plaintiff has presented a *prima facie* case, the court must consider and weigh all the evidence offered by plaintiff, including evidence favorable to defendant, to determine whether the *prima facie* case survives. *In re Estate of Goldstein*, 293 Ill. App. 3d at 709, citing *Kokinis*, 81 Ill. 2d at 155. " 'This weighing process may result in the negation of some of the evidence necessary to the plaintiff's *prima facie* case, in which case the court should grant the defendant's motion *** .' " *In re Estate of Goldstein*, 293 Ill. App. 3d at 709, quoting *Kokinis*, 81 Ill. 2d at 155.

If the trial court finds that the plaintiff has failed to present a *prima facie* case as a matter of law, the appellate standard of review is *de novo*. *In re Estate of Goldstein*, 293 Ill. App. 3d at 709, citing *Evans*, 268 Ill. App. 3d at 1102. If the trial court moves on to consider the weight and quality of the evidence, finding no *prima facie* case remains, the appellate standard of review is the deferential "manifest weight of the evidence" standard. *In re Estate of Goldstein*, 293 Ill. App. 3d at 709, citing *Evans*, 268 Ill. App. 3d at 1102.

The wife advocates a *de novo* standard of review, claiming that the trial court found that she failed to establish a *prima facie* case, as a matter of law, regarding the husband's fraud. We are not persuaded by the wife's argument for the following two reasons. First, the wife does not cite to, and we cannot find, where the trial court stated that it granted the husband's motion for a directed finding due to the wife's failure to make a *prima facie* showing of the husband's fraud, as a matter of law. Second, it is clear that the trial court proceeded to the second part of the analysis under the motion made pursuant to section 2—1110 of the Code (735 ILCS 5/2—1110 (West 2006)) when it determined that the wife's *prima facie* case did not survive after weighing the evidence, including evidence favorable to the husband. *In re Estate of Goldstein*, 293 Ill. App. 3d at 709.

Although the trial court incorrectly stated the standard it was applying to the husband's motion for a directed finding as "taking all of the evidence, all the testimony, in the most favorable light to [the wife]," it is clear from the transcript of the December 31, 2007, hearing that the trial court weighed the evidence, including evidence favor-

able to the husband. For instance, the trial court considered the husband's testimony that he obtained loans from his brother, Francis, and his friend, Palmer, secured by the shares of Mid-Plains common stock. Accordingly, the trial court proceeded to the second part of the analysis under the husband's motion made pursuant to section 2—1110 of the Code (735 ILCS 5/2—1110) (West 2006)), which compels our standard of review as the differential "manifest weight of the evidence" standard. *In re Estate of Goldstein*, 293 Ill. App. 3d at 709.

### 2. The Trial Court's Finding That the Wife Failed to Meet the Underlying Standard of Proof for Fraud Was Not Against the Manifest Weight of the Evidence

■ As noted, the trial court granted the husband's motion for a directed finding at the close of the wife's case, finding that the wife failed to meet her burden of proof with regard to the husband's alleged fraud. To prove fraud, the wife was required to show by clear and convincing evidence that: (1) the husband made a false statement of a material fact, (2) the husband knew that the statement of material fact was false, (3) the husband intended to induce the wife to act, (4) the wife relied on the truth of the statement, and (5) the wife was damaged. *D.S.A. Finance Corp. v. County of Cook*, 345 Ill. App. 3d 554, 560 (2003). The party alleging fraud must show justifiable reliance on the statements. *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (1980). In other words, the reliance must be reasonable. *In re Marriage of Broday*, 256 Ill. App. 3d 699, 703 (1993).

As noted, the wife's complaint alleged that the husband "lied" when he represented that the 4,406 shares of Mid-Plains common stock were held by the two creditors as collateral during the proceedings leading to the supplemental judgment for dissolution of marriage. The complaint further alleged in the alternative that the debts were either fabricated or that the shares of Mid-Plains were not utilized as collateral for the debts had the debts in fact existed.

At trial, the husband testified that he disclosed the existence of loans received from Francis George and Palmer, and that these loans were secured by 4,406 shares of Mid-Plains common stock in his "Supplemental Answer to Interrogatories and Notice to Produce" during the proceedings leading to the 1987 supplemental judgment for dissolution of marriage. At trial, the husband testified that he received a loan from his brother, Francis George, in the amount of $41,085 in September of 1981, and that he gave 2,739 shares of Mid-Plains common stock to Francis as collateral for the loan. The husband further testified that he borrowed a total of $50,000 in varying increments from his friend, John Palmer, from July 1982 to December 1983. The

husband testified that he gave Palmer promissory notes in exchange for each loan and that 1,667 shares of Mid-Plains common stock served as collateral for those loans.

The husband testified that he paid off the loans from Francis and Palmer in full plus interest over a period of 10 years. He testified that the bulk of the funds to pay off the loans came from the sale of real estate, including the sale of two condominiums in Pelican Landing, Florida, and a town house in Park Ridge, Illinois, for a total net gain of $400,000 in the early 1990s.

Palmer testified that he loaned the husband between $50,000 and $100,000 over a long period of time and that the husband eventually paid off the loans in full including interest. Palmer testified that the husband executed a promissory note every time he loaned the husband money. He further testified that the husband gave him the stock certificates and documents entitled "Irrevocable Stock and Bond Power" as collateral for the loans.

As noted, Francis George was not called as a witness at trial. The parties agree that the stock of Mid-Plains was valued at $66,000 at the time of the settlement agreement and that the wife's father had worked for the company. The evidence further disclosed that it was not until the husband sold the stock for $953,546.50, 14 years later, that the wife felt she was defrauded, when the value of the stock had increased when another company bought out Mid-Plains.

At the December 31, 2007, hearing, the trial court stated that its granting of the husband's motion for a directed finding at the close of the wife's case was based on its finding that the wife failed to establish that the husband's claimed debts at the time of the supplemental judgment for dissolution of marriage were falsified. Further, the trial court found that the wife failed to establish that the claimed loans were not secured by the husband's shares of Mid-Plains common stock. The trial court noted that the fact that Palmer never acted to assume ownership of the husband's shares in Mid-Plains did not establish that the claimed loans were falsified or that the shares were not used as collateral for the loans had the loans existed in the first place.

The trial court also found that the wife's reliance on the husband's representations, had they been false, were not reasonable since the wife had an opportunity to investigate whether the loans were falsified and whether the shares of Mid-Plains common stock were actually held as collateral for the claimed loans prior to the time of her settlement agreement and entry the supplemental judgment for the dissolution of marriage. The trial court noted that the wife had access to the original promissory notes, stock certificates, and stock powers incident to the loans, and had the promissory notes examined by two

experts to investigate their authenticity prior to entering into the settlement agreement.

█ Based upon the foregoing evidence, the trial court weighed the evidence heard, including that which was favorable to the husband, and determined that the wife failed to meet her burden of proof. First, that the husband made a false statement of material fact by clear and convincing evidence. The evidence disclosed that the husband obtained loans from his brother Francis and his friend Palmer. He testified that the loans were used to pay family expenses and the wife presented no evidence to the contrary. The husband's testimony and his discovery answers indicated that the loans were secured by the Mid-Plains stock. The stock powers indicated that the stock was transferred outright to his creditors, but the wife knew that because she was given that information in discovery. Notwithstanding the fact that the stock powers indicated an outright transfer of ownership, the testimony of the husband and Palmer indicated that the stock was being held only as security for the loans. We cannot say that the trial court's finding was against the manifest weight of the evidence. Contrary to the wife's argument, the testimony of the husband and Palmer indicates that the loans claimed by the husband at the time of the supplemental judgment for dissolution of marriage existed and that the shares of Mid-Plains stock were utilized as collateral for those loans. No evidence was introduced at trial by the wife to rebut that testimony.

Furthermore, the trial court found that the wife's reliance on the husband's representations was unreasonable, had the representations in fact been false. Even if the trial court found that the husband had made a false representation of a material fact by indicating that the loans were secured by the stock when the stock power indicated that there was an outright transfer of ownership to the creditors, we cannot say that the wife's reliance was reasonable under the manifest weight of the evidence or even the *de novo* standard. There is no evidence that indicates that the stock was treated as owned by the creditors. In fact, all of the evidence presented indicates that notwithstanding the legend on the powers, the parties treated the stock as collateral for the loan. The wife made a blanket argument that the husband should not be allowed to raise as a "defense" that she should have discovered whether the representations were false prior to entering into the 1987 settlement agreement with the information she had at hand because the husband was a "proven fraudfeasor" evidenced by the trial court's determination of misrepresentation in the 1982 separation agreement. The wife cites no authority on point for such a proposition, and therefore, her argument is waived. 210 Ill. 2d R. 341(h)(7).

The settlement agreement incident to the supplemental judgment for dissolution of marriage specified that the husband was to receive 4,406 shares of Mid-Plains common stock as his "sole and separate" property from the marital estate, as did the original judgment for dissolution. The wife testified that at the time of the supplemental judgment for dissolution of marriage, she questioned the legitimacy of the husband's claimed debts prior to agreeing to the 1987 settlement agreement. She testified that she presumed the debts to be "bogus" and hired an "examiner of questioned documents," and a forensic ink analyst, to examine the promissory notes the husband had executed to Palmer in exchange for the loans he received. The wife had the benefit of the advice of counsel prior to the time she entered into the settlement agreement and had the benefit of the expert opinions of the document examiner and forensic ink analyst who had examined the promissory notes. The wife also had the ability to obtain further discovery.

Furthermore, as noted, the findings of the document examiner and forensic ink analyst are not included in the record. We may infer that the findings of the document examiner and forensic ink analyst were not favorable to the wife's claim that the husband's claimed debts were fabricated and that the findings were not included in the record for that reason. *Jenkins v. Dominick's Finer Foods, Inc.*, 288 Ill. App. 3d 827, 832 (1997).

"A person may not enter into a transaction with [her] eyes closed to available information and then charge that [s]he has been deceived by another." *Chicago Export Packing Co. v. Teledyne Industries, Inc.*, 207 Ill. App. 3d 659, 663 (1990). If the party's reliance is unreasonable in light of the information open to her, the loss is considered her own responsibility. *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 575 (1998).

In addition, based upon the wife's opportunity to investigate further as to whether the husband's claimed debts were falsified, and whether the husband's claim that the shares of Mid-Plains common stock were actually held as collateral for the loans, we cannot find that the trial court's determination that the wife's reliance on the husband's representations was unreasonable was against the manifest weight of the evidence.

The third element in a fraud action that the wife was required to prove was that the husband intended to induce the wife to act in a certain manner. There is no evidence in this case that the wife ever wanted the Mid-Plains stock or any portion of it. She knew its value at the time she entered into the settlement agreement to be $66,000. It was valued at $50,085 at the time of the entry of the original judg-

ment for dissolution of marriage. Her father worked in the company. There is nothing in the record that would show any desire on her part to retain any portion of the shares. The husband was given the stock in the original judgment for dissolution of marriage and she agreed to give it to him in their later settlement agreement. There is no evidence to indicate that even if the husband had not disclosed the loans and the stock being used as collateral for those loans, that the result would have been any different. Since the husband was awarded the stock in the first judgment for dissolution of marriage, and since the section 2—1401 petition to vacate that judgment did not include the issue of awarding the husband the stock, the stock must have been a nonissue until it became worth close to $1 million, 14 years later. Although the trial court did not discuss the third element of fraud in its decision-making process, there was no evidence presented by the wife that the husband intended to induce the wife to agree to give him all of the stock in Mid-Plains.

The fourth element in a fraud action is that as a direct and proximate result of the fraud the wife was damaged. The stock was valued at $66,000 at the time of the settlement agreement. There is no evidence in the record that the husband knew that some company 14 years later would buy out Mid-Plains and that he could receive $953,546.50 for a stock with a previous value of $66,000. There is nothing in this record that would illustrate that the wife would have done anything different had she known everything she knows today other than the fact that the stock's value increase over the years. She testified that she would not have entered into the settlement agreement if she knew what she now knows, but cannot show any damages at the time she entered into the settlement agreement or at the time of this trial. *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 758-59 (1993) (generally, Illinois courts assess damages for fraud under the "benefit-of-the-bargain" approach). There is no evidence to show that the wife would have retained the stock for 14 years had she obtained a portion of the shares in the supplemental judgment for dissolution of marriage.

### 3. Remaining Issues

Finally, we note the husband's argument that the wife's complaint should be barred by the doctrine of *laches*. Having determined that the trial court's granting of the husband motion for a directed finding was not against the manifest weight of the evidence, we find no occasion to consider the husband's *laches* argument.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.