2024 IL App (2d) 240322-U
No. 2-24-0322
Order filed October 7, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF HUSSAIN SALBI, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No.   21-DV-499 |
| | ) | |
| TAMARA ALI, | ) | Honorable |
| | ) | Jennifer Louise Johnson, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court applied the incorrect legal standard in assessing petitioner's request for a modification of order allocating parenting time; (2) notwithstanding the application of the incorrect legal standard to petitioner's request for a modification of order allocating parenting time, the trial court did not err in granting respondent's motion for a directed finding with respect to petitioner's request for a modification of order allocating parental decision-making responsibilities and parenting time; and (3) the trial court did not did not err in denying petitioner's petition for adjudication of indirect civil contempt or for enforcement of judgment. We affirm.

¶ 2    On April 3, 2023, the circuit court of McHenry County entered a memorandum decision and judgment dissolving the marriage of petitioner, Hussain Salbi, and respondent, Tamara Ali. Among other things, the judgment of dissolution (1) divided the marital estate, including the

parties' retirement and investment accounts, (2) assigned to respondent sole parental decision-making responsibilities for the parties two minor children, S.S. and Y.S., and (3) awarded respondent a majority of parenting time. Following entry of the judgment of dissolution, petitioner and S.S. filed a joint "Amended Petition to Modify Allocation of Decision-Making Responsibilities and Parenting Time" (Petition to Modify) with respect to S.S. In addition, petitioner filed a "Petition for Adjudication of Indirect Civil Contempt or for Enforcement of Judgment" (Contempt Petition), alleging that respondent failed to comply with a provision of the judgment of dissolution with respect to the division of the parties' retirement and investment accounts. After petitioner and S.S. presented their case on the Petition to Modify, respondent moved for a directed finding, which the trial court granted. Following a separate hearing, the trial court denied the Contempt Petition. Petitioner appeals, arguing that the trial court erred in granting respondent's motion for a directed finding with respect to the Petition to Modify and in denying his Contempt Petition. We affirm.

¶ 3                                I.  BACKGROUND

¶ 4                          A. Dissolution of Marriage

¶ 5      The parties married on July 3, 2004. Two children were born during the marriage, S.S. (born on September 14, 2007), and Y.S. (born on October 28, 2011). On July 6, 2021, petitioner filed a petition for dissolution of marriage in the circuit court of McHenry County. On August 6, 2021, respondent filed a verified counterpetition for dissolution of marriage in the same court.

¶ 6      In pretrial proceedings, the trial court entered an agreed order appointing a guardian *ad litem* (GAL) for the children. In addition, the trial court entered an order pursuant to section 604.10(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/604.10(b) (West 2022)) after learning that S.S. viewed suicide-related videos on YouTube and expressed

difficulty dealing with his parent's divorce. Pursuant to that order, the trial court appointed Joseph Canevello to assess S.S.'s mental health, including whether to secure further treatment for the minor.

¶ 7    A multi-day trial commenced on August 18, 2022, before Judge Justin Hansen. The evidence presented at the trial is set forth in detail in this court's prior order (*In re Marriage of Salbi*, 2023 IL App (2d) 230210-U) and will be discussed below only as necessary to place in context the issues raised on appeal. On April 3, 2023, following the trial, Judge Hansen entered a "Memorandum Decision & Judgment" (Judgment) dissolving the parties' marriage, dividing the marital property, and addressing issues related to the children and support. Relevant here, Judge Hansen found that the parties' retirement and investment accounts were marital property. He gave specific values to each of those accounts based on stipulated evidence received at trial and ordered their division and assignment according to the following chart:

| Account | Assigned Value | Assigned to |
| --- | --- | --- |
| LPL Financial Account 5627 | $494.74 | Petitioner |
| LPL Financial Account 5278 | $46,580.14 | Respondent |
| LPL Financial Account 6706 | $15,402.59 | Petitioner |
| LPL Financial Account 8091 | $94,543.68 | 50/50 |
| Home State Bank | $663.02 | Respondent |

Thus, petitioner was awarded $63,169.17 of the retirement and investment accounts ($494.74+$15,402.59+($94,543.68/2)) and respondent was awarded $94,515 of the retirement and investment accounts ($46,580.14+($94,543.68/2)+$663.02).

¶ 8    Judge Hansen noted that the division of the retirement and investment accounts took into

consideration: (1) the value of each retirement account; (2) the parties' present income and economic circumstances; (3) petitioner's higher earnings; (4) that each party has future earning capacity and the ability to continue to save for retirement; and (5) the division of other assets and debt. The Judgment further provides:

"[Respondent] or her attorney shall arrange for the prompt preparation and entry of any transfer documents or QDROs [qualified domestic relations orders] to effectuate this division. [Petitioner] shall cooperate in providing account information and executing any necessary documentation. [Respondent] shall be responsible for the related costs. The parties shall equally share in any post-judgment gains and losses prior to the division being effectuated."

¶ 9    Regarding the minors, Judge Hansen, after extensively analyzing each statutory factor set forth in sections 602.5(c) (decision making) and 602.7(b) (parenting time) of the Act (750 ILCS 5/602.5(c), 602.7(b) (West 2022)), determined that it was in the children's best interest to assign respondent sole significant decision-making responsibilities and the majority of parenting time. In reaching this decision, Judge Hansen voiced concern about petitioner's reaction to S.S. searching for information about suicide. He observed that petitioner did not relay information about S.S.'s conduct to respondent, the GAL, or S.S.'s counselor for weeks and he did not take S.S. for an additional evaluation. Judge Hansen concluded that petitioner's lack of reaction was not in S.S.'s best interests. Moreover, although the children expressed a preference to spend more time with petitioner, Judge Hansen determined that the children's preference was outweighed by other concerns, including evidence of petitioner's physical abuse of respondent in front of the children, petitioner's ongoing controlling and manipulative behavior, petitioner's delayed reaction to S.S. searching for information about suicide, petitioner's attempts to interfere with respondent's

relationship with the children, and the GAL's recommendation that respondent have sole significant decision-making responsibilities and a majority of parenting time.

¶ 10                                    B. Post-Judgment Proceedings

¶ 11    On April 21, 2023, respondent filed a "Motion to Enforce, Modify, and Clarify Judgment for Dissolution of Marriage." Relevant here, count III of the motion related to the parties' retirement and investment accounts. Count III noted that the court assigned a value of $46,580.14 to LPL Financial Account 5278, which account is in petitioner's name but assigned in the Judgment to respondent, and a value of $94,543.68 to LPL Financial Account 8091, which account is in respondent's name but was ordered to be divided equally between the parties. Respondent alleged that petitioner informed her that LPL Financial Account 5278 had a zero balance. Further, respondent represented that the current value of LPL Financial Account 8091 had been reduced to $56,778. In addition, respondent indicated that she attempted to arrange a division of these assets with petitioner's attorney in accordance with the terms of the Judgment, but she received no reply. Respondent requested the court to approve the transfer of $691.70 (the difference between 50% of the value of LPL Financial Account 8091 as set forth in the Judgment ($47,271.84) and the value of LPL Financial Account 5278 as set forth in the Judgment ($46,580.14)) from LPL Financial Account 8091 to one of petitioner's banking accounts and enter an order to clarify that the transfer satisfied the division of the retirement and investment accounts.

¶ 12    On April 25, 2023, petitioner filed a motion to reconsider the Judgment. Among the issues petitioner asked the court to reconsider were its rulings on (1) the allocation of parental decision-making responsibilities and parenting time and (2) the division of the parties' retirement and investment accounts.

¶ 13    On May 16, 2023, Judge Hansen denied count III of respondent's motion. In the same

order, Judge Hansen denied petitioner's motion to reconsider with respect to the retirement and investment accounts. On May 25, 2023, Judge Hansen denied the remainder of petitioner's motion to reconsider "for the reasons stated on the record." On June 1, 2023, Judge Hansen entered another order for evaluation pursuant to section 604.10(b) of the Act (750 ILCS 5/604.10(b) (West 2022)), seeking advice in assessing S.S.'s mental health based on evidence and allegations that, as recently as April 2023, S.S. told the GAL that he would kill himself. Pursuant to that order, Judge Hansen appointed James Marks to perform an evaluation of S.S. and provide the court with a written report. Evaluator Marks authored a report dated June 27, 2023.

¶ 14    On June 21, 2023, petitioner filed a notice of appeal. On appeal, petitioner argued, among other things, that the trial court erred in dividing the parties' retirement accounts and allocating the parties' parental responsibilities. We affirmed the judgment of the circuit court. *In re Marriage of Salbi*, 2023 IL App (2d) 230210-U.

¶ 15                                    C. Petition to Modify

¶ 16    Meanwhile, on May 17, 2023, Judge Hansen appointed an attorney to represent S.S. "in a normal attorney-client relationship." On July 11, 2023, S.S. filed a "Petition to Modify Allocation of Decision-Making Responsibilities and Parenting Time." In the petition, S.S. alleged that since the filing of the Judgment, there has been a substantial change in circumstances. Specifically, S.S. stated as follows:

> "A. On April 14, 2023, [S.S.] communicated with the GAL indicating the severe mental health struggles resulting from residing full-time with *** Respondent noting that '[he] can't live like this' and that he would kill himself. The police were ultimately contacted to talk with [S.S.].
>
> B. Since the Court's ruling on April 3, 2023, [S.S.] has struggled to function during

his time at Respondent's residence most notably with homework.

C. Since the Court's ruling on April 3, 2023, [S.S.] experienced significant stress and anxiety while at Respondent's residence or as the time to leave Petitioner's residence and return to Respondent's residence approaches. On multiple occasions, including April 18, 2023 and May 23, 2023, the police had to be called in order to help effectuate [S.S.'s] transfer to Respondent's residence. Only upon being told *** Petitioner would get in trouble would [S.S.] agree to go.

D. Based upon the significant concerns with [S.S.'s] mental health since April 3, 2023, on June 1, 2023, this court entered an order appointing a 604.10 evaluator [(see 750 ILCS 5/604.10 (West 2022))].

E. The toll on [S.S.'s] mental health since the April 3, 2023 ruling, including but not limited to: anxiety, suicidal thoughts, depression, strain on relationship with both parents, is only worsening as time goes on and the upcoming school year approaches.

F. Since the Court's ruling on April 3, 2023, [S.S] has become frustrated in disputes with his mother and put a hole in the wall at her residence.

G. On June 29, 2023, after meeting with Dr. Marks, *** Respondent confronted [S.S.] with things [S.S.] said during the meeting and showed [S.S.] recordings of *** Petitioner to conflict things he said making [S.S.] upset."

S.S. argued that based upon the substantial change in circumstances which have occurred since April 3, 2023, it is necessary to modify the Judgment to provide that he reside a majority of time with petitioner and that petitioner be awarded sole decision-making with regard to S.S.

¶ 17 On August 31, 2023, after Judge Hansen questioned whether S.S. had standing on his own to motion to modify the allocation of parental responsibilities, petitioner orally moved to join the

petition. Judge Hansen granted the motion. On September 14, 2023, petitioner and S.S. filed the Petition to Modify at issue, which is largely identical to the petition filed by S.S. on July 11, 2023.

¶ 18    On April 15, 2024, a hearing on the Petition to Modify commenced before Judge Jennifer Johnson. Two witnesses testified at the hearing, S.S. and respondent.

¶ 19                                    1. S.S.'s Testimony

¶ 20    S.S. testified that he was aware of the April 3, 2023, Judgment that awarded parental decision-making responsibilities and a majority of parenting time to respondent. S.S. further testified that he is 16 years old and would turn 17 in September 2024. S.S. is a sophomore in high school. He is enrolled in three advanced placement (AP) classes and two honors courses. S.S. stated that he gets As and Bs in his classes. S.S. testified that his classes as a sophomore are more difficult than the classes he took as a freshman. As a freshman, S.S. got As, Bs, and Cs in his classes.

¶ 21    S.S. testified that prior to April 3, 2023, he and respondent were on a "communicating basis," but his ability to communicate with respondent has gotten "progressively worse." S.S. acknowledged that he commonly texts back and forth with respondent "regarding different things or ongoing differences." However, he stated that since April 3, 2023, he has been unable to communicate with respondent "in terms of homework and in terms of *** wanting to do activities." S.S. explained that when he is at respondent's house, he "just stay[s] in [the] office, eating, doing homework. No communication really." S.S. said that when he asks respondent to help him with homework, respondent "mostly ignores [him] or just says to search it on Google." S.S. also stated that he has "anxiety whenever [he] communicate[s] to [respondent] because sometimes she gives [him] negative thoughts and she says negative things." Regarding activities, S.S. testified that prior to April 3, 2023, he participated in Taekwondo and Kendo (sword fighting). S.S. still participates

in Taekwondo, although with reduced frequency. S.S. no longer takes Kendo. According to S.S., although respondent approved of Kendo "before the Court case happened, *** she [later] started denying it."

¶ 22    S.S. testified that he gets home from school at around 2:50 p.m. Y.S. gets home from school shortly before S.S. unless she stays later for school activities. S.S. testified that he is generally responsible for caring for Y.S. until respondent gets home from work. Prior to April 3, 2023, respondent was home within 30 minutes of S.S.'s arrival from school. After April 3, 2023, respondent's work hours changed and she does not arrive until 5 or 6 p.m. When respondent gets home, she asks if S.S. wants food while doing his homework. S.S. does not communicate with respondent for the rest of the night. S.S. said that prior to April 3, 2023, he, respondent, and Y.S. would eat dinner together. After April 3, 2023, that changed. S.S. attributed the change to "[l]ack of communication." S.S. testified that since respondent began working full time, there have also been issues with his ability to stay after school to take a test or get help. On such occasions, S.S. remains at school longer for respondent to pick him up because respondent will not allow petitioner to do so. Prior to respondent working full time, her ability to pick up S.S. was more flexible. S.S. testified that on petitioner's parenting days, he picks up S.S. when S.S. is ready.

¶ 23    S.S. testified that he feels stressed at respondent's house. Asked why, S.S. responded that, at respondent's house, he has "anxiety, depression, sometimes suicidal thoughts." S.S. attributed these feelings to isolation and the lack of socialization. S.S. acknowledged that respondent does not force him to stay in the office, but stated that when he asks respondent to go out places, "we usually don't because we are doing something else at the house." S.S. admitted that he could go out to the living room where respondent and Y.S. are and that he does so occasionally.

¶ 24    S.S. described petitioner's house as "more relaxed." S.S., petitioner, and Y.S. sit together

as a family for dinner. Further, S.S. has more time to do homework at petitioner's house because he is "less distracted, more concentrated." S.S. asks petitioner questions, so he gets his homework done more quickly. This leads to an earlier bedtime. S.S. goes to bed at respondent's house at 2 a.m. At petitioner's house, he goes to bed at 11 p.m. or 12 a.m.

¶ 25    S.S. testified about the allegations in the Petition to Modify. S.S. stated that in mid-April 2023, he contacted the GAL about struggles he was having with the parenting-time schedule. S.S. was experiencing depression and suicidal thoughts. He was also sad, did not want to communicate, and wanted to be left alone in his room. Days after his communication with the GAL, respondent told S.S. that he needed to go to the hospital. S.S. refused, so respondent called the police.

¶ 26    Regarding the allegation that he struggles to function during time at respondent's home, especially with homework, S.S. testified that at respondent's house he is distracted most of the time, has a hard time concentrating, and feels as if "there is no room to ask any questions." S.S. testified that respondent used to help him with homework. That changed, although S.S. could not remember when. S.S. stated that respondent will not answer any questions. She tells him to "go search it up." Accordingly, S.S. calls petitioner if he has a question.

¶ 27    With respect to the allegation that he has difficulty with transitions between his parents' homes, S.S. testified that when he tells respondent that he does not want to go with her, respondent threatens to call the police. S.S. acknowledged that the difficulty leaving petitioner's is no different than what he used to feel when he would transfer between his parents' residences prior to entry of the Judgment. Asked whether his struggles with departing petitioner's house for respondent's house had gotten worse, S.S. responded in the affirmative, stating that he "feel[s] more stressed when doing homework" and he "want[s] to stay more isolated in [his] room." S.S. further testified that after April 3, 2023, there were multiple occasions where respondent called the police because

S.S. did not want to leave petitioner's residence. When the police came, they told S.S. that he would have to go with respondent or petitioner would get in trouble. S.S. testified that prior to April 3, 2023, there were no incidents where the police were contacted or threats were made by respondent to call the police on him. S.S. testified that since the schedule set forth in the Judgment went into effect, he experiences "[m]ore anxiety, more stress, more isolation" while having parenting time at respondent's residence.

¶ 28    S.S. testified about an argument between him and respondent after April 3, 2023. S.S. wanted to go to petitioner's house because respondent "wouldn't provide [him] with any communication." S.S. asked respondent, but she ignored him. To get respondent's attention, S.S. turned off the television respondent was watching. In response, respondent "tried hitting [him] violently." S.S. testified that respondent's hand struck his right arm three or four times. S.S. testified that it did not hurt because he was wearing "layers of clothing." S.S. acknowledged one occasion prior to April 3, 2023, when he and respondent had a physical altercation over an iPad. At that time, S.S. tried to take the iPad from respondent because she had hidden it from him. Once S.S. got it, respondent started pulling it away from him.

¶ 29    S.S. also recounted that after April 3, 2023, he got mad after an argument with respondent, leading him to punch a hole in wall in the office. S.S. could not recall the nature of the argument. S.S. further testified that he damaged the wall in the office after a different argument with respondent in May 2023, although he could not recall how the damage occurred. S.S. testified that prior to April 3, 2023, he had never punched a hole in the wall at either of his parents' homes.

¶ 30    On cross-examination, S.S. provided additional testimony about the allegations in the Petition to Modify. S.S. testified that he was at respondent's house when he called the GAL and told her that he would kill himself if he had to reside full time with respondent. At that time,

respondent was out shopping with Y.S. S.S. acknowledged that respondent asked him to accompany her and Y.S., but he declined. S.S. denied having thoughts about suicide prior to the divorce being finalized. S.S. did recall telling the GAL that he was depressed prior to the finalization of the divorce, but he could not recall if he was at petitioner's house at the time. Moreover, he did not remember telling the GAL that he felt pressure from petitioner that was causing him to feel depressed. S.S. acknowledged telling the GAL that he was worried that petitioner might leave him if he did not spend more time with petitioner than respondent.

¶ 31     S.S. admitted that he was struggling to do homework while at respondent's house prior to the finalization of the divorce. During those struggles, S.S. would call petitioner to help him with his homework. After the finalization of the divorce, S.S. still calls petitioner from respondent's house when he is struggling with his homework. S.S. testified, however, that since entry of the Judgment, he calls petitioner more frequently for help with his homework. S.S. later stated that since entry of the Judgment, he calls petitioner less to help with his homework because he is trying to do things by himself and "get used to it."

¶ 32     S.S. testified that prior to entry of the Judgment, he spent a lot of time in the office at respondent's house doing homework and gaming. After the divorce was finalized, he continues to spend a lot of time in the office. S.S. testified that respondent usually has dinner prepared or makes it when she gets home from work. S.S. testified that respondent used to ask him to join her and Y.S. for dinner, but she no longer does. Asked why, S.S. responded, "[b]ecause I want to be more isolated, and I don't feel comfortable there. She asked several times in the past, but I started rejecting her because I didn't want to communicate with her whatsoever."

¶ 33     S.S. further testified that on multiple occasions, including on April 18, 2023, and May 23, 2023, the police had to be called to help effectuate S.S.'s transfer to respondent's residence. S.S.

initially stated that it was petitioner who called the police. S.S. stated that he wanted petitioner to call the police because he did not want to leave petitioner's house. S.S. later indicated that he could not recall who called the police on the dates alleged in the petition, but added that respondent did call the police "[o]n certain occasions." S.S. testified, for instance, that respondent called the police to her house shortly after S.S. told the GAL that he would kill himself.

¶ 34    S.S. denied experiencing anxiety, depression, or suicidal thoughts prior to the entry of the Judgment. S.S. testified that he could not recall a strain on his relationship with petitioner and he did not feel that his relationship with petitioner is strained now. He added that his relationship with petitioner is the same now as it was prior to the entry of the Judgment.

¶ 35    S.S. testified that respondent told him that she did not want him to take Kendo because it was too dangerous. S.S. admitted that respondent has not told him since the Judgment entered that he cannot take Taekwondo classes. S.S. testified that the reason he does not attend Taekwondo more frequently is because of "homework and more isolation, anxiety issues."

¶ 36    S.S. further admitted on cross-examination that he punched a hole in the wall at petitioner's house prior to the entry of the Judgment. According to S.S., however, the hole at petitioner's was made "[b]y accident." S.S. denied telling the GAL that he punched the hole in the wall at petitioner's because petitioner was causing him stress. S.S. did not recall telling the GAL that he punched the hole in the wall at petitioner's because he was afraid that petitioner would leave him. S.S. testified that he made the hole in the wall of respondent's house in April 2023 by punching it. When respondent's attorney noted that the hole is only one foot off the ground, S.S. responded, "I usually sit on the floor when watching—yeah." S.S. testified that he caused a second hole in the wall at respondent's house in May 2023. The second hole was two feet off the ground. S.S. testified that he punched the wall while he was positioned on his knees. S.S. denied that the holes in the

wall were caused by his desk chair backing up into the wall.

¶ 37    S.S. addressed the allegation in the Petition to Modify that after meeting with evaluator Marks, respondent confronted S.S. with things he said during the meeting and played him recordings of the petitioner to contradict things he said, thereby making S.S. upset. S.S. admitted that he did not know who was speaking on the recording, when it was recorded, or most of what was being said.

¶ 38                              2. Respondent's Testimony

¶ 39    Respondent testified as an adverse witness. Respondent recounted that on the date of the Judgment, she was a part-time employee at Home State Bank. She worked from 10 a.m. until 3 p.m. After entry of the Judgment, respondent began working full time. As a full-time employee, respondent's hours are from 8:30 a.m. until 5 p.m. Respondent testified that she is typically home from work by 5:15 p.m.

¶ 40    Respondent testified that since April 3, 2023, she has twice called the police on S.S. The first time was on May 1, 2023, because she wanted to take him to the hospital for a suicide evaluation and S.S. refused. The second time was in January 2024 because S.S. refused to come to the car when she went to pick him up from petitioner's house. Respondent also testified that, on a couple of occasions, she has told S.S. that she would call the police if he did not come out to the car when she went to pick him up from petitioner's house. Respondent could not recall if she had called the police on S.S. prior to April 3, 2023, but acknowledged that she had never threatened to call the police on S.S. before April 3, 2023.

¶ 41    Respondent acknowledged that when S.S. is at her residence, he spends a significant amount of time in the office. However, she testified that S.S. spends the same amount of time in the office now as he did prior to April 3, 2023. Respondent testified that the last time S.S. joined

her and Y.S. for dinner was at Thanksgiving 2023. Respondent invites S.S. to the table, but he declines. Respondent testified that prior to April 3, 2023, S.S. did not share meals with her and Y.S. Respondent stated that there is no set dinner time, so everyone does what he or she wants for dinner.

¶ 42　Upon questioning from her attorney, respondent testified that after S.S. told the GAL that he was feeling suicidal, the police were called to her residence the same day. Respondent testified that she did not make the call. She thought it was the GAL who called. Respondent further explained that after S.S. told the GAL that he was feeling suicidal, she took S.S. to evaluator Canevello. Canevello did not believe that S.S. was a suicide risk. However, petitioner expressed concern that S.S. would hurt himself, so respondent wanted to take him for a mental evaluation. When S.S. refused, she called the police in May 2023. Respondent also testified that prior to April 3, 2023, S.S. was ready to go with her when she arrived to pick him up at petitioner's residence. After entry of the Judgment, however, S.S. started refusing to go with her.

¶ 43　　　　　3. Motion for Directed Finding and Trial Court's Ruling

¶ 44　Following respondent's testimony, petitioner's counsel informed the court that he had no further evidence to present. The court admitted evaluator Marks's report into evidence. Respondent moved for a directed finding, arguing that the evidence presented did not establish any change in circumstances, much less a substantial change.

¶ 45　Petitioner initially argued that section 610.5 of the Act (750 ILCS 5/610.5 (West 2022)), which governs the modification of an order allocating parental responsibilities, provides two standards. For purposes of a change in parenting time, the movant must demonstrate a "change in circumstances." In contrast, for purposes of a change in decision-making, the movant must show a "substantial change." Petitioner next asserted that S.S.'s testimony was unrebutted and reflected

several changes since April 3, 2023. Petitioner argued that there is a "significant worsening and increase in the struggles that [S.S.] is going through." S.S.'s attorney also argued that S.S.'s "unrebutted" testimony established a substantial change in circumstances.

¶ 46 On April 17, 2024. The trial court issued an oral decision in the matter. Initially, the court rejected petitioner's argument that section 610.5 of the Act (750 ILCS 5/620.5 (West 2020)) provides separate legal standards for assessing a request to modify parenting time and a request to modify parental decision-making responsibilities. The court concluded that only one standard applies and that standard is a "substantial change" in circumstances. The court added that while "[u]nderstanding what the correct standard is is important," it "d[id]n't know that it would make a huge difference in this case."

¶ 47 On the merits, the court stated that, in ruling on the motion for a directed finding, it "weighed the evidence and considered the credibility of the witnesses and the weight and quality of the evidence." In doing so, the court questioned the accuracy of S.S.'s testimony. It noted that S.S. denied experiencing anxiety, depression, or suicidal ideation prior to April 3, 2023, but the Judgment entered on that date clearly reflects otherwise. The court found that S.S.'s "unwillingness or inability to be accurate about" his mental health struggles "raise[d] grave concerns for the Court and color[ed] the remainder of [S.S.'s] testimony." After considering "the totality of the circumstances," "the applicable law," and "the statutory standards," the court granted the motion for a directed finding. The court concluded that there was insufficient evidence that the allegations raised in the Petition to Modify (and other allegations that were not specifically set forth therein) constituted substantial changes.

¶ 48                                   D. Contempt Petition

¶ 49 Meanwhile, on June 21, 2023, the same day that petitioner filed his notice of appeal, he

filed the Contempt Petition in the circuit court. In the Contempt Petition, petitioner noted that the Judgment awarded him 50% of LPL Financial Account 8091 and directed respondent or her attorney to arrange for the prompt preparation of any documents to effectuate the division. Petitioner alleged that respondent refused to abide by the terms of the Judgment, having failed to transfer to him his share of LPL Financial Account 8091 or promptly prepare documentation to effectuate the division. Petitioner further stated that after the close of proofs in the trial of the dissolution proceedings, but prior to the court entering the Judgment, both parties reduced the balances of their respective retirement accounts. Petitioner alleged, however, that on the date of the Judgment, respondent had a balance of approximately $57,369.24 (referring to LPL Financial Account 8091). Petitioner further alleged that after the trial court ruled on respondent's post-judgment motion, respondent "removed or otherwise transferred the entire balance of her account so as to deprive [petitioner] of the share he was awarded per the Judgment." Petitioner argued that respondent's conduct was "willful and contumacious, and without compelling cause or justification." Petitioner asked the court to enter an order or issue a rule requiring respondent to appear and state why she should not be adjudicated in indirect civil contempt for failing to abide by the terms of the Judgment. Alternatively, if the court determined that respondent's conduct was not willful and contumacious, petitioner requested that the court enforce the Judgment and "require the prompt transfer of all retirement funds to [him]."

¶ 50    In her response to the Contempt Petition, respondent asserted that petitioner "defrauded [the] Court regarding the balance of his own retirement account, communicated to [respondent] after proofs had closed but before [the] Court entered its Judgment by bragging to her and taunting her that he had drained the balance of his own retirement account, and that he did so for the purpose of effectively stealing funds which he believed the Court may allocate to [respondent]."

Respondent continued that, "[o]nly after receiving this communication did [she] respond by similarly reducing the value of her account, in order to protect against [petitioner's] fraudulent behavior."

¶ 51    On April 18, 2024, Judge Johnson held a hearing on the Contempt Petition. At the start of the hearing, the court took judicial notice of the Judgment. Petitioner then called respondent as an adverse witness. Respondent testified that the Judgment details four accounts from LPL Financial. Among them, LPL Financial Account 8091, with an assigned balance of $94,543.68, was in petitioner's name but ordered to be divided equally between petitioner and respondent. Respondent agreed that, pursuant to the Judgment, she or her attorney was responsible for arranging the preparation of documents necessary to effectuate the division of the LPL Financial accounts. Respondent testified that she contacted the parties' financial advisor, provided him with the Judgment, and asked him to comply with the ruling. Respondent acknowledged, however, that no funds from LPL Financial Account 8091 were ever distributed to petitioner. Respondent further acknowledged that she "drained" LPL Financial Account 8091 to a "*de minimus* balance." She noted that the balance of LPL Financial Account 8091 on January 1, 2023, was $67,540.46. In May 2023, she withdrew $55,000. As of May 31, 2023, the balance of LPL Financial Account 8091 was $2741.19. Respondent testified that she did not give to petitioner any of the funds she withdrew in May 2023. Respondent explained that she made the withdrawal because she thought petitioner "had done the same thing to [her]." Respondent testified that at some point petitioner asked for an update about the transfer of the account. Respondent told petitioner to "file a motion" about it.

¶ 52    On examination by her attorney, respondent testified that she communicated with the parties' financial advisor by email and over the phone in April 2023. When respondent asked the

financial advisor to transfer the funds based on the court's ruling, he told her that the attorneys "need to talk because the numbers don't match what is in the Court order." Based on what the financial advisor told her, respondent did not believe it was possible to comply with what the trial court ordered. On further examination by petitioner's attorney, respondent acknowledged that she never informed petitioner about her conversation with the financial advisor.

¶ 53     Following arguments, the court ruled that the clear intention of the Judgment was to divide the balance of LPL Financial Account 8091 equally between the parties. The Judgment required either respondent or her attorney to arrange for the prompt preparation and entry of the documents necessary to effectuate the division. The court determined that the evidence clearly established that respondent failed to comply with the terms of the Judgment in this regard. The burden therefore shifted to respondent.

¶ 54     Respondent then testified that she withdrew money out of the account after Judge Hansen denied her motion to clarify "how we can handle the transfer." Respondent testified that given Judge Hansen's ruling and her financial advisor's response to her request, she was "stuck" and "couldn't get it done." Respondent testified that when she withdrew the money, it was not her intent to violate the court order. Respondent noted that none of the accounts were transferred, including one that was in petitioner's name that was awarded to her. Respondent testified that she believed that petitioner had emptied the retirement account that was supposed to be awarded to her. Respondent's belief was based on communications between her and petitioner in which he stated that he sold the retirement account to pay for the mortgages on the parties' two homes.

¶ 55     On cross-examination, respondent testified that petitioner spent the entire amount ($46,000) in the retirement account assigned to her. Accordingly, when Judge Hansen denied her motion to clarify she assumed that she could do what she wanted with the retirement account.

Respondent also admitted that it was not a surprise that the value of petitioner's retirement account had been reduced during the litigation because Judge Hansen granted petitioner leave of court to access and use marital funds held in the retirement account for the purpose of paying marital expenses. Respondent further testified on cross-examination that on May 26, 2023, petitioner asked her to provide an update about transferring his share of LPL Financial Account 8091. In response, respondent told petitioner to "file a motion" about it. Respondent acknowledged that she had withdrawn the $55,000 from the retirement account prior to this communication between her and petitioner. Respondent further explained that petitioner "spent the money that was assigned to [her]. So, for that reason, and since Judge Hansen did not rule on [her motion to clarify], then the amount is the same. Whatever was assigned to me was assigned to me. The value is the same."

¶ 56    In closing, petitioner argued that pursuant to the Judgment, either respondent or her attorney were responsible for arranging the prompt preparation and entry of any transfer documents necessary to effectuate the transfer of the retirement accounts. Yet, that never happened. Petitioner argued that respondent's failure to comply was willful and contumacious in that respondent "essentially engaged in self help." Moreover, petitioner was allowed by court order to make withdrawals from his retirement account for the payment of maintenance of the marital estate. Petitioner argued that respondent has not offered a reasonable excuse as to why her conduct in withdrawing funds from the retirement account was allowed. Petitioner posited that "[t]he best the Court got was that she reached out to an account manager, and he said because the account value is different than it is in the judgment, it couldn't be done." Petitioner argued that respondent never related to him the problem she was having with the transfers. Instead, when petitioner asked her about the retirement account, she told him to "file a motion," which he did. Petitioner further argued that if the court determines that respondent's conduct was not willful, he pleaded in the

alternative for purposes of enforcement.

¶ 57    Respondent argued that once petitioner drained his retirement account to zero, it made it impossible for her to arrange for the division of the retirement assets in the manner contemplated by the Judgment. Respondent argued that if she is held in contempt, the only remedy is to order her to have her attorney prepare the documents necessary to divide or transfer the accounts based on the balances "that exist in [the] judgment."

¶ 58    The trial court took the matter under advisement. On April 29, 2024, the trial court issued a memorandum decision and order on the Contempt Petition. The court found the Judgment unambiguous. It required the parties to evenly split the funds in LPL Financial Account 8091 based on the value stipulated by the parties as set forth in the Judgment. Further, respondent or her attorney were required to "arrange for the prompt preparation and entry of any transfer documents or QDROs to effectuate this division." The court found that petitioner established that respondent did not comply with the Judgment, thereby shifting the burden to respondent to explain her noncompliance. The court found respondent's testimony at the April 18, 2024, hearing believable. While not condoning respondent's conduct, the court further found that respondent was unable to effectuate the transfer of the funds. In this regard, the court determined that respondent intended to comply with the Judgment. Respondent contacted her financial advisor, provided him with a copy of the Judgment, and instructed the financial advisor to comply with the terms of the ruling. However, respondent "was told transfers could not be accomplished because the funds detailed in the Judgment no longer existed." As such, respondent was unable to comply with the Judgment to effectuate the transfer. The court found that it was not possible for respondent to provide half of the stipulated value of LPL Financial Account 8091 to petitioner and keep the other half for herself as of April 3, 2023. As such, the court concluded that respondent's failure to comply with the

Judgment was not willful and contumacious.

¶ 59    Additionally, the court declined petitioner's request to enforce the Judgment with respect to the retirement accounts. The court noted that during argument, the parties suggested that the court could fashion some equitable remedy which might include redivision of LPL Financial Account 8091. The court noted that the parties provided some additional information about the balances of the LPL Financial accounts on dates subsequent to the stipulated evidence used by Judge Hansen. The court explained that property rights created by a judgment of dissolution become vested when the judgment is final and a trial court lacks general jurisdiction to modify an order affecting such rights. *In re Marriage of Hubbard*, 215 Ill. App. 3d 113, 116 (1991). Absent some circumstance such as fraud, coercion, or misrepresentation, property provisions in a marital settlement agreement are not modifiable after 30 days. *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 42. The court stated that while there are certain "legal pathways" to obtain relief when the 30-day time frame has expired after a final order, a petition for indirect civil contempt was not one of these methods. See *In re Marriage of Hubbard*, 215 Ill. App. 3d at 116-118. As such, the court concluded that it did not have "endless jurisdiction to graft new provisions to a property division contained in a Judgment of Dissolution." Thus, the court determined that it was without power to construct some equitable solution under the guise of enforcement or modification of the Judgment. On May 16, 2024, petitioner filed a notice of appeal from the trial court's decision on the Petition to Modify and the Contempt Petition.

¶ 60                                    II. ANALYSIS

¶ 61    On appeal, petitioner raises two principal issues. First, he argues that the trial court erred in granting respondent's motion for a directed finding with respect to the Petition to Modify. Second, he contends that the trial court erred in denying his Contempt Petition.

¶ 62 Prior to addressing petitioner's arguments, we note that respondent, as appellee, has not filed a brief in this appeal. However, because the record is straightforward and the claimed errors are such that we can decide them without the aid of an appellee's brief, we will consider the merits of the appeal on petitioner's brief only. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 63                                   A. Petition to Modify

¶ 64 Petitioner initially argues that the trial court erred in granting respondent's motion for a directed finding with respect to the Petition to Modify. Petitioner's argument is twofold. First, petitioner claims that the trial court applied an incorrect legal standard in assessing his request to modify the allocation of parenting time. Second, he argues that multiple changes have occurred in the circumstances of S.S. and respondent such that a modification of the allocation of parental decision-making responsibilities and parenting time was necessary to serve S.S.'s best interests.

¶ 65        1. Legal Standard for Modifying Allocation of Parental Responsibilities

¶ 66 Petitioner first contends that the trial court applied an incorrect legal standard in assessing his request to modify the allocation of parenting time. According to petitioner, section 610.5 of the Act (750 ILCS 5/610.5 (West 2022)), which governs the modification of orders allocating parental responsibilities, sets forth one legal standard ("changed circumstances") for modifying an order allocating parenting time and a different legal standard (a "substantial change" in circumstances) for modifying an order allocating parental decision-making responsibilities. As noted above, petitioner advanced this argument in the trial court, but Judge Johnson concluded that the same legal standard—a showing of a "substantial change" in circumstances—applied to both the modification of an order allocating parental decision-making responsibilities and the modification of an order allocating parenting time.

¶ 67    Whether the trial court applied the correct legal standard is a question of law, subject to *de novo* review. *In re Marriage of Hipes*, 2023 IL App (1st) 230953, ¶ 35; *C. Szabo Contracting, Inc. v. Lorig Construction Co.*, 2014 IL App (2d) 131328, ¶ 23; *In re Marriage of Sobol*, 342 Ill. App. 3d 623, 627 (2003). Additionally, to properly address respondent's argument, we must engage in statutory construction. The primary objective of statutory construction is to ascertain and give effect to the intent of the legislature. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 56. The most reliable indicator of legislative intent is the language of the statute itself, given its plain and ordinary meaning. *State Bank of Cherry*, 2013 IL 113836, ¶ 56. Only where the language of the statute is ambiguous or where a literal interpretation of the statute would either lead to absurd results or thwart the goals of the statutory scheme, may a court look beyond the express language of the statute and consider extrinsic aids of construction. *Graham v. Van Rengen*, 2024 IL App (2d) 230611, ¶ 44. Statutory construction is also a question of law, subject to *de novo* review. *People v. Manning*, 2018 IL 122081, ¶ 16.

¶ 68    We begin our analysis with the applicable statute. Modifications of orders allocating parental decision-making responsibilities and parenting time are governed by section 610.5 of the Act (750 ILCS 5/610.5 (West 2022)). That provision states in relevant part as follows:

> "(a) Unless by stipulation of the parties or except as provided in Section 603.10 of this Act, no motion to modify an order allocating parental decision-making responsibilities, not including parenting time, may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his or her mental, moral, or physical health or significantly impair the child's emotional development. Parenting time may be modified at any time, without a showing of serious endangerment, upon a showing of

changed circumstances that necessitates modification to serve the best interests of the child.

(b) (Blank).

(c) Except in a case concerning the modification of any restriction of parental responsibilities under Section 603.10, the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5 (West 2022).

¶ 69 Petitioner disputes the trial court's finding that the substantial-change-in-circumstances standard set forth in section 610.5(c) of the Act (750 ILCS 5/610.5(c) (West 2022)) applies to both a request to modify the allocation of parental decision-making responsibilities and a request to modify the allocation of parenting time. Petitioner does not dispute that the legal standard applicable to a request to modify the former is a "substantial change" in circumstances. See 750 ILCS 5/610.5(c) (West 2022). As to a modification of the latter, however, petitioner asserts that the correct legal standard is merely "changed circumstances" as provided by section 610.5(a) of the Act (750 ILCS 5/610.5(a) (West 2022)).

¶ 70 Examining the language of section 610.5(a) (750 ILCS 5/610.5(a) (West 2022)), we observe that the statute clearly distinguishes between parental decision-making responsibilities and parenting time. See *In re Marriage of Mark O.*, 2024 IL App (4th) 230875-U, ¶ 19 ("[T]he allocation of parenting time and the allocation of parental decision-making responsibilities are two independent things according to the Act."). The first sentence of section 610.5(a) addresses the

timing of a request to modify an order allocating parental decision-making responsibilities. 750 ILCS 5/610.5(a) (West 2022) (providing that, absent reason to believe a child is seriously endangered, "no motion to modify an order allocating parental decision-making responsibilities, not including parenting time, may be made earlier than 2 years after its date."). The second sentence of section 610.5(a) states that "[p]arenting time may be modified at any time, without a showing of serious endangerment, upon a showing of changed circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2022). The plain language of the second sentence of section 610.5(a) addresses two topics. First, it dictates the timing of a request to modify an order allocating parenting time. Such an order may be modified "at any time." Second, it specifies the legal standard applicable to the modification of an order allocating parenting time. 750 ILCS 5/605.10(a) (West 2022)). That legal standard is simply "changed circumstances." Had the legislature intended the change to be "substantial," it could have easily inserted such language in the second sentence of section 610.5(a). However, no such language was included and we cannot read into the statute language that is not there. See *People v. Ramirez*, 214 Ill. 2d 176, 183 (2005) (noting that court was constrained to apply the plain language of the statute as written where the legislature could have included certain language in a statute but did not); *People v. Maillet*, 2019 IL App (2d) 161114, ¶ 28 ("The plain language of the statute does not say 'public' restroom, and the legislature could have easily included the word 'public.' Again, we cannot read into the law a limitation that is not there."). We therefore conclude that the plain language of section 610.5(a) simply requires a party seeking the modification of an order allocating parenting time to show "changed circumstances." Accordingly, the trial court applied an incorrect standard.

¶ 71   We acknowledge that the third district, in *In re Marriage of Trapkus*, 2022 IL App (3d)

190631, ¶¶ 21-29, held that the "substantial change" in circumstances standard set forth in section 610.5(c) of the Act (750 ILCS 5/610.5(c) (West 2016)) applies to a request for the modification of an order allocating parenting time. In *Trapkus*, the court tacitly acknowledged that the plain language of section 610.5(a) (750 ILCS 5/610.5(a) (West 2016)) references the legal standard, "changed circumstances," applicable to a request to modify an order allocating parenting time. *Trapkus*, 2022 IL App (3d) 190631, ¶ 24 ("[I]t may appear that section 610.5(a) contains a legal standard applicable to motions seeking the modification of a parenting-time allocation.") Nevertheless, the court determined that "a review of the evolution of the modification statutes" mandated the conclusion that the "substantial change" in circumstances standard set forth in section 610.5(c) (750 ILCS 5/610.5(c) (West 2016)) applied to a request to modify an order allocating parenting time. *Trapkus*, 2022 IL App (3d) 190631, ¶ 24. Given the plain language of section 610.5(a), however, there was no need for the court to examine extrinsic aids of statutory construction. See *Brunton v. Kruger*, 2015 IL 117663, ¶ 24 ("[W]e will not utilize extrinsic aids of statutory interpretation unless the statutory language is unclear or ambiguous."); *Graham*, 2024 IL App (2d) 230611, ¶ 44 (noting that only where the language of the statute is ambiguous or where a literal interpretation of the statute would either lead to absurd results or thwart the goals of the statutory scheme may a court look beyond the express language of the statute and consider extrinsic aids of construction). As such, we decline to follow *Trapkus*.

¶ 72    In short, we conclude that the trial court applied the incorrect legal standard in assessing petitioner's request for a modification of the allocation of parenting time. The correct legal standard is "changed circumstances" as set forth in section 610.5(a) of the Act (750 ILCS 5/610.5(a) (West 2022)). Notwithstanding the trial court's application of the incorrect legal standard, we conclude that the court did not err in granting respondent's motion for a directed

finding at the close of petitioner's case on the Petition to Modify. We turn to that issue now.

¶ 73                                    2. Directed Finding

¶ 74    Next, petitioner argues that the trial court was provided "unrebutted" evidence of numerous changes, several of which were substantial, that had occurred in the circumstances of S.S. and respondent such that a modification of the allocation of parental decision-making responsibilities and of parenting time is necessary to serve S.S.'s best interests. Petitioner therefore requests that we find the trial court's entry of a directed finding was against the manifest weight of the evidence, reverse the decision of the trial court, and remand the matter for further proceedings.

¶ 75    The trial court's assessment of a motion for a directed finding is subject to a two-part analysis. *Minch v. George*, 395 Ill. App. 3d 390, 398 (2009). At the first stage, the trial court determines as a matter of law whether the plaintiff has presented a *prima facie* case. *Minch*, 395 Ill. App. 3d at 398. To satisfy this burden, the plaintiff must proffer at least some evidence on every element of the underlying cause of action. *Moles v. Illinois Farmers Insurance Co.*, 2023 IL App (1st) 220853, ¶ 16. If the plaintiff does not satisfy this burden, the trial court must grant the motion and enter judgment for the defendant. *Moles*, 2023 IL App (1st) 220853, ¶ 16. Because this determination is a question of law, the trial court's ruling at this stage is subject to *de novo* review. *Moles*, 2023 IL App (1st) 220853, ¶ 17. If the court determines that the plaintiff has presented a *prima facie* case, the court proceeds to the second stage of the analysis. *L.D.S., LLC v. Southern Cross Food, Ltd.*, 2017 IL App (1st) 163058, ¶ 33.

¶ 76    At the second stage, the trial court considers the totality of the evidence presented by weighing the evidence, assessing the credibility of the witnesses, drawing reasonable inferences therefrom, and deciding whether the *prima facie* case survives. *Moles*, 2023 IL App (1st) 220853, ¶ 17; *Minch*, 395 Ill. App. 3d at 398; see also 735 ILCS 5/2-1110 (West 2022). The trial court

views the case " 'in the same manner as it would had the defendant rested at the close of the plaintiff's case.' " *In re Estate of Etherton*, 284 Ill. App. 3d 64, 68 (1996) (quoting *Kokinis v. Kotrich*, 81 Ill. 2d 151, 158 (1980)). This weighing process may result in the negation of some of the evidence presented by the plaintiff. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 276 (2003). If sufficient evidence supports the plaintiff's *prima facie* case, then the court must deny the motion for a directed finding. *Moles*, 2023 IL App (1st) 220853, ¶ 17. Conversely, if sufficient evidence does not exist, then the court must grant the motion for a directed finding. *Moles*, 2023 IL App (1st) 220853, ¶ 17; see also 735 ILCS 5/2-1110 (West 2022). When a trial court directs a finding after weighing all the evidence, we will reverse its finding only if it is against the manifest weight of the evidence. *Minch*, 395 Ill. App. 3d 390, 398 (2009). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if it is unreasonable, arbitrary, or not based on the evidence. *Graham*, 2024 IL App (2d) 230611, ¶ 53. Moreover, we review the result at which the trial court arrived rather than its reasoning and may affirm on any basis apparent in the record. *In re Estate of McDonald,* 2024 IL App (2d) 230195, ¶ 45.

¶ 77    Here, the trial court did not explicitly state whether it granted respondent's motion for a directed finding at the first or second stage of the analysis. However, in addressing respondent's oral motion for a directed finding, the trial court stated that it reached its decision after weighing the evidence, considering the credibility of the witnesses, and assessing the weight and quality of the evidence. At another point in its ruling, the court stated that it had considered "the totality of the circumstances," "the applicable law," and "the statutory standards." Accordingly, we will presume that the trial court found that petitioner presented some evidence on each element essential to his claim, but that, after considering and weighing the totality of the evidence presented during his case in chief, it found that sufficient evidence did not exist to support petitioner's *prima facie*

case. As such, we will apply the manifest-weight-of-the-evidence standard. Indeed, petitioner admits that it is "reasonable to conclude" that the manifest-weight standard is the correct standard of review in this appeal.

¶ 78    Petitioner contends that the trial court's decision to grant a directed finding in respondent's favor was against the manifest weight of the evidence. According to petitioner, the trial court was provided sufficient evidence that multiple changes, "both simple and substantial," had occurred in the circumstances of S.S. and respondent such that a modification of parental responsibilities is necessary to serve S.S.'s best interests. In particular, petitioner claims that after entry of the Judgment: (1) S.S. suffers from worsening stress, anxiety, and depression as a result of his interaction with respondent, and also has suicidal thoughts; (2) S.S. is "isolated" and alone at respondent's residence and "mostly ignored" by respondent; (3) respondent modified her work schedule and S.S. is left alone after school for several hours; (4) respondent threatens to call the police on S.S and has called the police on him previously; (5) S.S.'s communication with respondent has become "progressively worse" since the entry of the Judgment; and (6) an incident of domestic violence occurred between S.S. and respondent in which respondent "repeatedly slapp[ed]" S.S. Petitioner further posits that most of S.S.'s testimony was unrebutted, so it could not be rejected by the finder of fact.

¶ 79    At the outset, we address petitioner's claim that S.S.'s testimony could not be rejected because it was "unrebutted." Petitioner directs us to the Illinois Supreme Court for this proposition, but does not provide a citation to any case from that court in support thereof. A party forfeits review of an argument on appeal by failing to support it with citation to relevant authority. *International Union of Operating Engineers Local 965 v. Illinois Labor Relations Board, State Panel*, 2015 IL App (4th) 140352, ¶ 20.

¶ 80    Forfeiture aside, respondent disputed portions of S.S.'s testimony. But even if S.S.'s testimony had been "unrebutted," the trial court was not required to accept it. While our supreme court has stated that the trier of fact "cannot arbitrarily or capriciously reject the testimony of an unimpeached witness" (*People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981)) this does not mean that the trier of fact is required to accept an uncontradicted witness's testimony under all circumstances (see *People v. Ferguson*, 204 Ill. App. 3d 146, 151 (1990) ("The trier of fact is not required to accept [the] defendant's version of the facts, but may consider its probability or improbability in light of the surrounding circumstances.")). When sitting as the trier of fact, a trial court is entitled to accept as much or as little of a witness's testimony as it deems appropriate. See, *e.g.*, *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 58 (rejecting proposition that a trier of fact must accept certain testimony because it is unrebutted since doing so would remove some of the discretion from the trier of fact as to how much weight should be afforded evidence); *Franciscan Communities, Inc. v. Hamer*, 2012 IL App (2d) 110431, ¶ 47 (noting that the trier of fact is free to disbelieve any witness).

¶ 81    As noted earlier, in ruling on a motion for a directed finding at the second stage of the analysis, it is within the province of the trier of fact to assess the credibility of the witnesses, assign weight to the evidence, draw reasonable inferences therefrom, and resolve conflicts in the evidence. See *Moles*, 2023 IL App (1st) 220853, ¶ 17; *Minch*, 395 Ill. App. 3d at 398; see also 735 ILCS 5/2-1110 (West 2022). In this case, the trial court questioned the accuracy of S.S.'s testimony. The court noted that S.S. denied being depressed, suffering anxiety, or having suicidal thoughts prior to April 3, 2023, but the Judgment reflected otherwise. The court concluded that that S.S.'s "unwillingness or inability to be accurate about" his mental health struggles "raise[d] grave concerns for the Court and color[ed] the remainder of [S.S.'s] testimony." Thus, the trial

court was not required to accept S.S.'s testimony even to the extent that it was "unrebutted." We now turn to petitioner's individual allegations of error.

¶ 82    As noted above, the allocation of parenting time may be modified upon a showing of "changed circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2022). The allocation of decision-making responsibilities may be modified upon a showing of a substantial change in circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests. 750 ILCS 5/610.5(c) (West 2022). Ultimately, we conclude that the trial court's decision to grant respondent's motion for a directed finding was not against the manifest weight of the evidence because petitioner did not present sufficient evidence that changes, either simple or substantial, had occurred in the circumstances of S.S. and respondent such that a modification of the allocation of either parenting time or parental decision-making responsibilities was necessary to serve S.S.'s best interests.

¶ 83    We begin with petitioner's first assignment of error, which concerns S.S.'s mental health. Petitioner's entire argument on this point is that "[S.S.] testified that, since the entry of the Judgment of Dissolution of Marriage on April 3, 2023, his self-described stress, anxiety, and depression had worsened as a direct result of his interactions with [r]espondent, and that he also has 'suicidal thoughts.' " While not minimizing the seriousness of S.S.'s mental-health issues, petitioner did not present sufficient evidence that a change, either simple or substantial, occurred in S.S.'s mental-health status following entry of the Judgment. The evidence of record shows that S.S. experienced mental health issues prior to April 3, 2023. The Judgment references that S.S. relayed information to the GAL in April 2022 that he had watched videos about suicide on YouTube and that he was depressed because he felt pressure from petitioner and was worried that petitioner would leave him. The Judgment also notes that S.S. reported to evaluator Canevello that

the level of parental discord causes him stress.

¶ 84    The record further establishes that S.S. continues to experience mental-health issues following entry of the Judgment. At the hearing on the Petition to Modify, S.S. testified that he contacted the GAL in mid-April 2023 about struggles he was having with the parenting-time schedule. S.S. stated that he was sad, did not want to communicate, wanted to be left alone, and was experiencing depression and suicidal thoughts. S.S. also repeatedly testified at the hearing on the Petition to Modify that he suffers from anxiety, depression, and suicidal thoughts. However, the trial court questioned the accuracy of S.S.'s testimony, specifically noting discrepancies in his testimony as it related to the issue of his mental health. More significantly, there was no evidence as to *how* the symptoms S.S. reported after entry of the Judgment were qualitatively or quantitatively worse than the symptoms he reported before entry of the Judgment. In addition, there was no expert testimony that S.S.'s condition had worsened. To the contrary, in his report, evaluator Marks wrote that he "did not see a psychiatric reason to limit custody time from either parent." Without more, all that can be said based on the record before us is that S.S. experienced mental-health issues prior to entry of the Judgment and he continues to experience mental-health issues after entry of the Judgment. This is insufficient to warrant a finding that a change—simple or substantial—had occurred in the status of S.S.'s mental health.

¶ 85    Next, petitioner asserts that S.S. is "isolated" and alone at respondent's residence and "mostly ignored" by respondent. According to petitioner this constitutes a "change that occurred after the entry of the Judgment." Petitioner does not develop this argument further. Again, petitioner failed to present sufficient evidence that a change, either simple or substantial, occurred with respect to this allegation. It is true that S.S. testified that after the finalization of his parents' divorce, he spends a lot of time alone in the office at respondent's house. But S.S. acknowledged

that prior to the entry of the Judgment, he also spent a lot of time alone in the office at respondent's house doing homework and gaming. He admitted that no one forces him to stay in the office while he is at respondent's house, that he could go out to the living room where respondent and Y.S. are, and that he occasionally joins Y.S. and respondent. Respondent also acknowledged that when S.S. is at her residence, he spends a significant amount of time in the office. However, she stated that the amount of time S.S. spends in the office did not increase following entry of the Judgment. Moreover, the evidence does not support the idea that respondent "mostly ignore[s]" S.S. The record shows that respondent asks S.S. to join her and Y.S. in various activities, including shopping and eating, but S.S. declines. Thus, the evidence of record was insufficient to warrant a finding that a change—simple or substantial—had occurred with respect to this allegation.

¶ 86    Next, petitioner notes that after entry of the Judgment, respondent modified her work schedule, resulting in S.S. being "left alone" after school for "several hours" or requiring him to wait "two hours" at school to be picked up on days where he stays to take a test or get help. This allegation was not set forth in the Petition to Modify. Regardless, petitioner failed to present sufficient evidence that this constituted a change, either simple or substantial. First, the evidence does not support that S.S. is "left alone" after school. S.S. testified that Y.S. gets home from school shortly before him unless she stays after school for activities. There was no evidence that this practice was different prior to the entry of the Judgment. Second, while it is true that respondent modified her work schedule after entry of the Judgment, this did not result in a changed circumstances that necessitates a modification to serve the child's best interests. S.S. acknowledged that prior to the entry of the Judgment, he would get home from school before respondent arrived from work. The same is true after entry of the Judgment. Further, S.S. indicated that prior to entry of the Judgment, on days he would stay at school to take a test or get help, he

would have to wait for respondent to pick him up. The same is true after entry of the Judgment. While respondent arrives home a little bit later than she did prior to entry of the Judgment and S.S. might have to wait longer for a pick up on days he stays after school, petitioner does not explain why this constitutes a changed circumstance that necessitates a modification to serve S.S.'s best interests. Indeed, the record established that S.S. is a 16-year-old, intelligent boy who is enrolled in AP and honors classes. He is clearly capable of caring for himself after school until respondent arrives or while waiting for respondent to pick him up after school. Moreover, there was no evidence that respondent was unavailable by phone or text if necessary. We thus reject the claim that this constitutes either a substantial change in circumstances or a changed circumstance that necessitates a modification to serve S.S.'s best interests.

¶ 87    Next, petitioner complains that respondent has called the police on S.S. and that she threatens to call the police on S.S. Petitioner argues that this never occurred prior to entry of the Judgment. While this may be evidence of a difference, petitioner does not elaborate why this constitutes a substantial change in the circumstances or a changed circumstance that necessitates a modification to serve S.S.'s best interests. S.S.'s testimony regarding the times respondent called the police was equivocal. For her part, respondent testified that she called the police on S.S. twice. The first time was in May 2023 because she wanted to take S.S. to the hospital for a suicide evaluation and S.S. refused. This demonstrates a concern for S.S.'s wellbeing and does not constitute a changed circumstance, either simple or substantial. The second time was in January 2024 because S.S. refused to come to the car when she went to pick him up from petitioner's house. This was merely an effort at compliance with the Judgment, not a changed circumstance, either simple or substantial.

¶ 88    Petitioner also asserts that communication between S.S. and respondent has become

"progressively worse" since entry of the Judgment. Petitioner does not otherwise elaborate on this claim. S.S. did testify that he and respondent were on a "communicating basis" prior to the entry of the Judgment on April 3, 2023, but that his ability to communicate with respondent has gotten "progressively worse." Specifically, S.S. complained that he is unable to communicate with respondent "in terms of homework and in terms of *** wanting to do activities" and that respondent gives him "negative" feelings when they communicate. The record, however, establishes that S.S. and respondent communicate regularly. S.S. testified that he asks respondent homework questions. The evidence also suggests that they discussed his extracurricular activities. S.S. also testified that he communicates with respondent via text message. In addition, respondent asks S.S. to join her and Y.S. shopping and eating. From S.S.'s standpoint, the communications may be "worse" in the sense that he does not appreciate the responses that he receives from respondent, but the record clearly establishes that there is ongoing communication between S.S. and respondent. This does not constitute a change, either simple or substantial.

¶ 89    Finally, petitioner cites the incident in which respondent hit S.S.'s arm after he tried to get her attention by turning off the television she was watching. Petitioner asserts that this was a changed circumstance because prior to April 3, 2023, "there were no reported incidents of domestic violence directed at [S.S.] by [r]espondent, other than a 'tug of war' over an iPad." It is not unusual for a parent and child to argue. Indeed, as petitioner concedes, S.S. and respondent had a dispute over an iPad prior to the entry of the Judgment. Moreover, S.S. testified to other disputes with respondent, which allegedly caused him to become frustrated and punch a hole in the wall of the office. While not condoning physical violence between a parent and child, this simply did not constitute a changed circumstance, either simple or substantial.

¶ 90    In short, for the reasons set forth above, the trial court's decision to grant respondent's

motion for a directed finding on the Petition to Modify was not against the manifest weight of the evidence.

¶ 91                                    B. Contempt Petition

¶ 92    Petitioner also argues that the trial court erred in denying his Contempt Petition. Specifically, petitioner notes that respondent admitted that she did not arrange for the prompt preparation and entry of any transfer documents or QDROs to effectuate the division of LPL Financial Account 8091. Further, by her own admission, respondent withdrew $55,000 from the same account after the entry of the Judgment. Petitioner contends that the trial court erred in not finding respondent in contempt because respondent "could have complied with an equal division of the account funds after the Judgment, but chose not to." Petitioner further asserts that even if respondent's actions were not willful and contumacious, the trial court could have still enforced the Judgment to effectuate the equal division of LPL Financial Account 8091.

¶ 93                                          1. Contempt

¶ 94    Generally, civil contempt occurs when a party fails to do something ordered by the trial court, resulting in the loss of a benefit or advantage to the opposing party. *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006). Contempt that occurs outside of the presence of the trial court is classified as indirect contempt. *In re Marriage of Charous*, 368 Ill. App. 3d at 107. The existence of a court order and proof of willful disobedience of that order are essential to any finding of indirect civil contempt. *In re Marriage of Charous*, 368 Ill. App. 3d at 107. The initial burden is on the petitioner to prove by a preponderance of the evidence that the alleged contemnor has violated a court order. *In re Marriage of Charous*, 368 Ill. App. 3d at 107. The burden then shifts to the alleged contemnor to show that noncompliance with the court's order was not willful or contumacious and that he or she had a valid excuse for the failure to follow the court order. *In re*

*Marriage of Charous*, 368 Ill. App. 3d at 107-08. Contumacious conduct is " 'conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court.' " *In re Marriage of Charous*, 368 Ill. App. 3d at 108 (quoting *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 349 (1992)).

¶ 95 Whether a party is guilty of indirect civil contempt is a question of fact for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984). As this court has noted, our supreme court "has never expressly abandoned the *Logston* standard in the context of reviewing orders on contempt petitions." *In re Marriage of Barile*, 385 Ill. App. 3d 752, 759 n.3 (2008). The *Logston* rule "makes explicit a system of double deference to the trial court in contempt proceedings." *Shamrock Chicago Corp. v. Wroblewski*, 2019 IL App (1st) 182354, ¶ 29. If the trial court's factual findings are in dispute, we review the record and only reverse those findings that are against the manifest weight of the evidence. *Shamrock Chicago Corp.*, 2019 IL App (1st) 182354, ¶ 29. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or if it is unreasonable, arbitrary, or not based on the evidence. *Graham*, 2024 IL App (2d) 230611, ¶ 53. If the trial court's factual findings are not in dispute or if those findings are consistent with the manifest weight of the evidence, we review the contempt order for an abuse of discretion, considering the relevant facts. *Shamrock Chicago Corp.*, 2019 IL App (1st) 182354, ¶ 29.

¶ 96 In his brief, petitioner cites two cases involving contempt, one for the standard of review and one outlining the burden-shifting process. He does not, however, provide this court with citation to any other authority regarding the law on indirect contempt proceedings. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that an appellant's brief include

"[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Violations of Rule 341 may result in forfeiture of an issue on appeal. *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23. Although we choose not to apply the forfeiture rule here, we strongly advise counsel to strictly comply with all Illinois Supreme Court Rules in the future. *Morse v. Donati*, 2019 IL App (2d) 180328, ¶ 16 (cautioning that the rules of our supreme court have the force of law and are not mere suggestions).

¶ 97    On the merits, we conclude that the trial court properly denied the Contempt Petition on the basis that respondent's conduct was not willful or contumacious. The Judgment provided that LPL Financial Account 8091 was to be divided equally between the parties and that respondent or her attorney "shall arrange for the prompt preparation and entry of any transfer documents or QDROs to effectuate this division." At the hearing on the petition, petitioner established that respondent did not comply with these terms. Having established a *prima facie* case that respondent violated the Judgment, the burden shifted to respondent to explain her noncompliance. The trial court found that respondent attempted to comply with the Judgment. The court noted respondent's testimony that she contacted the financial advisor and instructed him to comply with the ruling. However, the financial advisor told respondent that the "attorneys need to talk because the numbers don't match what is in the Court order." Based on this record, we cannot say that respondent's conduct was willful or " 'calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessen[ed] the authority and dignity of the court.' " *In re Marriage of Charous*, 368 Ill. App. 3d at 108 (quoting *In re Marriage of Fuesting*, 228 Ill. App. 3d at 349). The trial court found respondent's testimony believable. It was for the trial court to determine respondent's credibility. See *Shamrock Chicago Corp.*, 2019 IL App (1st) 182354, ¶ 30 (noting that the

manifest-weight-of-the-evidence standard gives deference to the trial court's fact-finding where divergent inferences could have been drawn from the undisputed facts). Thus, the trial court's conclusion that respondent was unable to effectuate the transfer and, accordingly, her failure to comply with the Judgment was not willful or contumacious, was not against the manifest weight of the evidence.

¶ 98    Prior to moving on, we address two points raised in petitioner's brief. First, petitioner faults respondent for not presenting the emails showing she contacted the financial advisor and for not calling the financial advisor to testify. However, petitioner does not explain why he could not have requested this evidence or called the financial advisor himself. Second, petitioner complains that the trial court's factual findings are not correct based on the evidence that was adduced at the hearing. Petitioner notes that the trial court stated that respondent was told by the financial advisor that the transfers could not be made "because the funds detailed in the Judgment no longer existed." Petitioner points out that respondent's verbatim testimony was that the financial advisor told her that the "attorneys need to talk because the numbers don't match what is in the Court order." While the trial court's statement does not precisely track respondent's testimony, it reflects the gist of it. That is, at the time respondent requested the transfers, the amount of the funds in the accounts "no longer existed" in the sense that they did not equal the amounts detailed in the Judgment. Accordingly, we decline to find error on either of these grounds.

¶ 99                                    2. Enforcement

¶ 100   Finally, petitioner argues that the trial court erred in denying his alternative request for enforcement of the Judgment. The trial court interpreted petitioner's request for enforcement as one for the modification of the provisions related to the division of the retirement and investment accounts. The court determined that since more than 30 days had elapsed since entry of the

Judgment, the Judgment was final and it lacked jurisdiction to modify these provisions. We agree with the trial court.

¶ 101   The entry of a final order in a dissolution proceeding becomes a conclusive adjudication after the passage of 30 days from its rendition. *In re Marriage of Milliken*, 199 Ill. App. 3d 813, 817 (1990); *In re Marriage of Redmer*, 111 Ill. App. 3d 317, 320 (1982). Thus, after the expiration of 30 days, the provisions of the judgment related to property rights becomes fixed (*In re Marriage of Rifkin*, 114 Ill. App. 3d 555, 559 (1983)) and are not modifiable (*In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 42). However, even after a judgment of dissolution becomes final, a court retains indefinite jurisdiction to enforce its orders relating to the dissolution of marriage. *Waggoner v. Waggoner*, 78 Ill. 2d 50, 53 (1979); *In re Marriage of Hendry*, 409 Ill. App. 3d 1012, 1016 (2011). Thus, whether the trial court had jurisdiction to grant petitioner relief depends on whether petitioner sought to enforce the Judgment or to modify it.

¶ 102   There is a distinction between enforcing a judgment of dissolution and modifying a judgment of dissolution. A party seeks to enforce a judgment when that party "requests a determination of the parties' rights and obligation with respect to the terms" of the judgment (*In re Marriage of Figliulo*, 2015 IL App (1st) 140290, ¶ 12) or "is attempting to enforce the parties' rights and obligations" that are "clearly laid out in the marital settlement agreement and judgment of dissolution" (*In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 44 (quoting *In re Marriage of Hall*, 404 Ill. App. 3d 160, 165 (2010))). Conversely, a party seeks to modify the judgment when that party is seeking to impose "new or different obligations" on the parties. *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 44 (quoting *In re Marriage of Hall*, 404 Ill. App. 3d at 165). To determine whether a party seeks to enforce or modify the dissolution judgment, we look to the terms of the judgment of dissolution. *In re Marriage of Figliulo*, 2015 IL App (1st)

140290, ¶ 12. Our review is *de novo*. *In re Marriage of O'Malley*, 2016 IL App (1st) 151118, ¶ 42 ("The trial court's jurisdiction over a modification to the parties' MSA is a question of law and thus subject to *de novo* review.").

¶ 103   The Judgment ordered the equal division of LPL Financial Account 8091 and required respondent or her attorney to "arrange for the prompt preparation and entry of any transfer documents or QDROs to effectuate this division." In his petition for adjudication of indirect civil contempt or for enforcement of judgment, petitioner requested that:

> "In the alternative, if the Court finds that Respondent's conduct is not willful and contumacious but otherwise finds that the retirement funds are owed, that this Honorable Court enforce its April 3, 2023 Judgment *and require prompt transfer of all retirement funds to [petitioner],* and find that such failure to make such transfer was without compelling cause or justification." (Emphasis added.)

By requesting the prompt transfer of "all" retirement funds to him, petitioner clearly sought to impose "new or different" obligations on the parties. As such, he requested a modification of the Judgment, not the enforcement of rights and obligations clearly laid out therein.

¶ 104   In his brief, petitioner notes that post-dissolution gains and losses of a retirement account are a by-product of dividing marital assets with fluctuating values (see *In re Marriage of David*, 367 Ill. App. 3d 908, 915 (2006)) and directs us to *In re Marriage of Platt*, 2015 IL App (2d) 141174, ¶ 20, for the proposition that a dissolution judgment that has become impossible to carry out should be enforced to match the judgment's overall intent. We have no quarrel with the proposition set forth in *Platt*. But the overall intent of the Judgment in this case was to divide LPL Financial Account 8091 equally between the parties while, at the same time, providing respondent with a larger percentage of the retirement and investment accounts considering various factors,

including the value of each retirement account, the parties' income and economic circumstances, petitioner's higher earnings, each party's future earning capacity and ability to continue to save for retirement, and the division of other assets and debt. Transferring "all" of the retirement funds to petitioner after petitioner effectively zeroed out the balance of the retirement account which was awarded in the Judgment to respondent would not implement a division that would honor the overall intent of the Judgment. As such, we agree with the trial court that it lacked jurisdiction to address petitioner's request, as he was seeking a modification of the division of the retirement and investment accounts and not merely the enforcement of the Judgment.

¶ 105                                    III. CONCLUSION

¶ 106   For the reasons set forth above, we affirm the judgment of the circuit court of McHenry County.

¶ 107   Affirmed.