NOTICE
Decision filed 04/15/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 241259-U

NO. 5-24-1259

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| APRIL ENLOW, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 22-CH-54 |
| | ) | |
| KAREN MORRIS and OREIDO MORRIS, | ) | Honorable |
| | ) | Ronald S. Motil, |
| Defendants-Appellants. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Cates and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where the trial court applied the wrong burden of proof to the bench trial evidence, we reverse and remand.

¶ 2                                    I. BACKGROUND

¶ 3    This case arises from a family dispute over ownership of a trailer, carport, and garage which rested on real estate located at 2001 5th Street, Madison, Illinois ("the property"). The case began in August 2022 when Karen and Oreido Morris (Karen and Oreido) filed an eviction action against Stedman Williams (Stedman), who was the paramour of their daughter, April Enlow (April). April then filed a claim for quiet title and specific performance contending that she and her parents, Karen and Oreido, had entered into an oral agreement for April to purchase the property. The eviction action against Stedman was subsequently dismissed, and the case proceeded to a two-day

1

bench trial on October 29, 2024, and November 15, 2024, on April's claims to quiet title and for specific performance.

¶ 4    The following evidence was adduced at trial. April is the adult daughter of Karen and Oreido. In 2016, April lived with her parents next door to the property, which had been owned by Charles VanVleet (Charles). After Charles's death, the property was inherited by his daughter, Vickie VanVleet Johnson (Vickie). Karen negotiated to purchase the property from Vickie for the sum of $11,000. The property was titled solely in Karen and Oreido's names.

¶ 5    April testified that before this litigation began, her and her mother were very close. April had intended to move out of her parents' residence and was looking at apartments in Granite City. Karen went with her when she made a $500 deposit on an apartment, which leased for $800 per month. Karen then broached the subject with April to purchase the property from her and Oreido. Karen and April inspected the trailer, which was in obvious need of repair. April was reluctant to accept Karen's offer until Karen convinced her that the pros of having Karen readily available for daycare outweighed the cons of trailer's condition. When Karen said her monthly payments would only be $300 per month as opposed to an $800 per month apartment lease, April changed her mind and agreed.

¶ 6    April testified that she and her mother orally agreed that April would purchase the property for $10,000, payable at $300 per month, beginning in September 2016, with the final payment to be made using April's income tax refund. April was also responsible for paying the real estate taxes. April testified that Karen assured her the home would be in her name once the purchase price was paid in full. April moved into the property in April of 2016 and began making monthly payments. April testified that she paid a total of approximately $8,100 and that she consistently paid $300 per month from September 2016 through March 2018. April said that the monthly

2

payments were made in cash, which she gave to Karen who in turn paid Vickie. April testified that after she paid off the property with her tax refund, she had a housewarming party to celebrate her new home ownership. April said Karen was present, along with other family members, and it was clearly understood that she now owned the property.

¶ 7    In approximately April 2020, Stedman, who was also the father of April's youngest child, moved into the property with April. Shortly after Stedman moved in, the bathtub in the main bathroom fell through the floor. Stedman testified that his friend, Derick Flynn (Derick), was a contractor and assisted Stedman in repairing the bathroom floor. The bathroom renovation expanded to extensive renovations to other rooms in the trailer, which included plumbing, flooring, bathroom remodeling, and other improvements. Stedman testified that Exhibit C was a spreadsheet itemizing some of the receipts for the trailer renovations. Exhibit C totaled $21,182.21. There were more expenses, but Exhibit C consisted of the total for which he and April had receipts.

¶ 8    Derick testified that Exhibit C-1 was an invoice in the sum of $10,375.50, which was specifically for repairs to the bathroom where the remodeling project began. He estimated that the total remodeling costs were approximately $25,000 and that he donated his labor. Derick testified that Oreido personally observed the renovations and, in fact, helped him and Stedman with some of the trailer repairs. Derick also attended the housewarming party and confirmed that Karen was present.

¶ 9    Karen testified that neither she nor Oreido ever agreed to sell the property to April. Karen characterized April's $300 monthly payments alternatively as reimbursements for groceries, contributions toward expenses for one of her granddaughter's private school tuition, and some sort of life-lesson training regimen to teach April how to become self-sufficient. Karen's testimony regarding the total monthly payments made by April varied from $4,000 to $4,200 to $6,000.

3

Oreido corroborated Karen's testimony that they never agreed to sell April the property, and he also denied helping Stedman or Derick make any repairs to the property.

¶ 10    At the conclusion of the trial, the trial court made the following relevant rulings and findings:

"THE COURT: *** I am going to approve the plaintiffs' case. *** I do not think the Statute of Frauds applied, and specifically because of the part performance that was accomplished, I think that takes the situation out of the Statute of Frauds bar.

I am going to allow the plaintiff's complaint to quiet title against the defendants, and I'm going to order the defendants to quit claim their interest to the plaintiff.

And some of the reasoning *** is by *a preponderance of the evidence ***.* The $300 a month I do find that was meant for the purchase of the property. *** And while the complete purchase price may not have been arrived at, I think there has been so much improvement to the property that that makes up a big difference.

*** I think the case law does provide that since Mr. Morris did know all the work that was being done to the property, living right next door, it doesn't stand to reason that he didn't know about the partial performance that they were doing to the property, and because of that, I can order you to submit your interest in the property also to plaintiff.

***

I was also struck by the testimony of the gentleman who did the repairs to the— where he said first they started off with the bathtub, and once you fix that then it extends to a kitchen, and once you make that improvement it extends possibly into the bedroom I think he said, but I was also struck by the fact that while doing all of this work he was

4

borrowing tools from Mr. Morris, but then also was invited to a house warming party. So I thought his credibility was very good.

*** [W]hy would April and Mr. Williams be making all of these improvements to the property if in fact they didn't believe that they were going to get that property ***.

*** There is some strong dislike by the Morrises of Mr. Williams, and I think that's where things started breaking down, *** —I'm not going to call anybody a liar in this case at all, but I think the testimony of the Morrises are [*sic*] clouded by the animosity they have for Mr. Williams. ***

*** I think there was a meeting of the minds between the parties as to the price of property and the identity of the real estate. ***

*** I will allow a specific performance of the oral contract. Statute of Frauds does not apply. I will allow the quieting of the title against the defendants, and I'm ordering the defendants to quit claim their title to the property to their daughter, April Enlow." (Emphasis added.)

¶ 11                                II. ANALYSIS

¶ 12    The trial court's oral pronouncement following closing arguments clearly referenced the applicable burden of proof as a preponderance of the evidence. "To entitle a plaintiff to specific performance of an oral contract or verbal promise, the promise or contract must be clear, explicit and convincing." *Pocius v. Fleck*, 13 Ill. 2d 420, 425-26 (1958). The clear and convincing standard requires proof greater than a preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt. *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995).

¶ 13    We find that the trial court applied the wrong burden of proof. April asks us to affirm the trial court's ruling since, even if the proper burden of proof is applied, the evidence supports the

5

trial court's ruling. In support of her argument that we have authority to do so, April relies upon *In re Marriage of Salbi*, 2024 IL App (2d) 240322-U. There, the petitioner claimed that the trial court applied an incorrect legal standard in assessing his request to modify the allocation of parenting time. The appellate court stated that notwithstanding the trial court's application of the incorrect legal standard as set forth in section 610.5(a) of the Illinois Marriage and Dissolution of Marriage Act, the trial court did not err in granting the respondent's motion for a directed finding at the close of petitioner's case on the petition to modify. 750 ILCS 5/610.5(a) (West 2022). We do not find this case to be persuasive. It is incumbent upon the trial court to apply the correct burden of proof to the evidence it heard at the bench trial.

¶ 14 III. CONCLUSION

¶ 15 Accordingly, we reverse the trial court's ruling and remand the case with directions to the trial court to apply the correct burden of proof to the evidence heard at the bench trial.

¶ 16 Reversed and remanded with directions.